IN UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DOUGLAS S. BROWN, STEPHEN KAWELTI and JAMES A. PROSSER, | |
| Plaintiffs, | Case No. 05-10713-PBS |
| v. | **[LEAVE TO FILE GRANTED PER ORDER DATED JULY 12, 2006]** |
| BANK OF AMERICA, N.A., | |
| Defendant. | |

**DEFENDANT BANK OF AMERICA N.A.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUMMARY JUDGMENT (AS TO COUNTS TWO AND THREE)**

**INTRODUCTION**

Briefing can sometimes sharpen the issues, as it has here. Plaintiffs' opposition reveals no factual dispute that would impede this Court from deciding the four issues presented. Moreover, Plaintiffs have no legal basis for opposing summary judgment. In particular:

***"Wrongful verb" claim.*** When Defendant first filed its motion, there was only Judge Young's decision in *Morrissey v. Webster Bank, N.A.*, 417 F. Supp. 2d 183 (D. Mass. 2006) rejecting Plaintiffs' contention that the verb "may" on Bank of America's ATM Decal violates the Electronic Funds Transfer Act, 15 U.S.C. § 1693 ("EFTA"). Now, there are three.

***$500,000 "cap"—The EFTA Claim.*** Plaintiffs do not dispute that Count I, their claim under EFTA, is subject to a single $500,000 "cap" and not four separate "caps" (one for each state). The Court should enter partial summary judgment as to this purely legal issue.

***$500,000 "cap"—State law claims.*** Plaintiffs contend that their claims under Massachusetts General Law ch. 93A ("Chapter 93A") and under California law are un-capped. They are wrong. The state court in *Hazelaar v. Bank of America* decided this issue. Judge Kramer's holding ought to be more than usually persuasive, because it arises from an earlier-

filed but parallel state-court class action. Indeed, the named plaintiff (Stephen Kawelti) would be a member of the *Hazelaar* class. Thus, for reasons of comity, this Court should not decide differently the same issue—in essentially the same case—even if it wanted to disagree.

**No loss causation.** Plaintiffs contend that the identical "as a result of" language in the federal Truth in Lending Act, 15 U.S.C. § 1640(a)(1) ("TILA")—which has been construed to require actual reliance—should not be construed in the same manner under the EFTA. Plaintiffs are wrong. They are also wrong about Chapter 93A and California law not requiring "actual reliance." Both do.

The Court should enter partial summary judgment in favor of Bank of America on the EFTA count, and summary judgment on the Chapter 93A and Section 17200 counts.

## ARGUMENT IN REPLY

**I.    THE COURT SHOULD ENTER PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' "WRONGFUL VERB" CLAIM**

Plaintiffs offer several arguments for their "wrongful verb" claim. All were rejected already by Judge Young and by two other courts.

Plaintiffs contend that *Morrissey* is distinguishable because Webster Bank exempted 77.5% of noncustomers from surcharges, whereas Bank of America exempts less than ½%. (Plaintiffs' Response to Defendant's Motion for Partial Summary Judgment, p. 5 ("Response").) Not so.

First, Judge Young decided the question as a matter of statutory interpretation. Waiver percentages did not figure in his analysis. In rejecting Plaintiffs' claim, he characterized "Morrissey's interpretation [as] ridiculous—his claim bordering on the frivolous." *Cf.*, *Webster Bank, supra*, 417 F. Supp. 2d at 189. Plaintiffs never explain how a factual distinction could overcome a legal "interpretation" found by Judge Young to be "ridiculous."

Second, waiver percentages played no role in the other ATM signage decisions. In *Mohler v. Manufacturers and Traders Trust Co.*, 2006 WL 901639 (D. Md., March 24, 2006), for example, Judge Motz made no mention of the defendant-bank's waiver percentages. Rather,

he concluded: "I fully agree with Judge Young's incisive and thorough analysis, and on the basis of his opinion I find in favor of defendant on the issue." Likewise, Judge Kramer[1] reached the same result following trial. *Hazelaar v. Bank of America*, No. CGC 03-420622 (Tentative Statement of Decision on Phase II Trial Issues, pp. 4-7, April 17, 2006) ("*Hazelaar II*").[2]

Nor do waiver percentages matter to the Federal Reserve Board ("FRB"). The FRB's February 6, 2006 "clarifying" amendments to Reg. E provide that ATM operators can use the verb "may" in their ATM Decals "if there are *circumstances* under which a fee will not be imposed for such services." 12 C.F.R. § 205.16(c)(1) (italics added). Reg. E says "circumstances"—there is no minimum percentage that limits a bank's use of the verb "may."

Third, Plaintiffs' interpretation makes no sense. How would an ATM operator know which verb to use if a violation depended on an after-the-fact determination? And if the numerator or denominator were to change suddenly, would the ATM operator have to scrape off its "may" Decals and replace them with a "will" Decal? Finally, what percentage is acceptable? And where in the statute does it provide that 25% is acceptable but, say, 1% isn't?

Fourth, Plaintiffs have it wrong factually. Bank of America's overall fee-waiver percentage for the four states was 4%, or one in 25 transactions. Plaintiffs insist it is ½%, but to get there they need to exclude foreign-issued ATM/debit cards, the Bank's largest fee-waiver category. (*See* Plaintiffs' Response to Defendant Bank of America's Statement of Material Facts, p. 4 and Ex. 1 "Response to SMF").)[3] That makes no sense. The ATM Decal notifies *all*

---

[1] Judge Kramer is the "Complex Case Department" judge sitting in the San Francisco Superior Court to whom all "complex cases," including class actions, are singly-assigned.

[2] Copies of the two *Hazelaar* decisions—*Hazelaar I* and *Hazelaar II*—are attached to the accompanying "Appendix of Out-of-State Cases."

[3] Broken down by state, in Massachusetts almost 10% of cash withdrawal transactions during the class period were fee-exempt. This translates into one non-customer ATM user out of ten. (Response to SMF, Ex. 1 ["MA Combined: 9.87%"].) For Rhode Island, it was over 16%, or one in six. (*Id.*) Plaintiffs' decision to exclude foreign card transactions isn't "statistical" evidence (*cf.*, Response, p. 5), it is selective editing.

non-customers—including those holding ATM cards issued by foreign banks—that the user "may" be surcharged.

Plaintiffs ask the Court to ignore the 28 million fee-waived "foreign card" transactions during the class period. (Declaration of Jennifer Haag, Ex. A [filed March 24, 2006].) As to those users, however, the verb "may" is plainly correct. In fact, the verb "will" would be seriously misleading, given that these users would *not* be surcharged.

Plaintiffs next argue that the FRB's Reg. E Amendments are not retroactive. (Response, p. 8.) That is beside the point. The FRB itself describes its amendments as a "clarification" of existing law (*see* Final Rule, 71 F.R. 1638, 1655-56 (Jan. 10, 2006)), a determination that Judge Young and Judge Kramer accepted. *Morrissey*, *supra*, 417 F. Supp.2d at 190; *Hazelaar II*, p. 6.

Finally, Plaintiffs advance several other arguments that Judge Young and/or Judge Kramer have already rejected:

- Plaintiffs ask the Court to force Bank of America to rewrite its ATM Decals to use the verb "will" and then list the categories of exceptions. (Response, p. 5.) But Judge Young correctly found that the posting of exceptions would itself violate the EFTA and Reg. E. *Morrissey*, *supra*, 417 F. Supp. 2d at 189-190.

- Plaintiffs again advance their "legislative history" argument. (Response pp. 5-7.) But Judge Young rejected this too, as did Judge Kramer. *Morrissey*, *supra*, 417 F. Supp. 2d at 191 n.14; *Hazelaar II*, p. 7.

- Plaintiffs contend that the Bank's "click through" screen, which they concede uses the verb "will," cannot cure the grammatical offense. (Response, p. 7.) Yet, Judge Young held that it does, and further that it makes perfect sense to read the two disclosures in harmony (as the FRB instructed).[4]

---

[4] Said Judge Young: "The notice "on the machine" should state that a fee "may" be imposed, while the notice "on the screen" should appear only when a fee is imposed. This interpretation of the statute and regulation accounts not only for the on-machine notice provision in the statute, but also logically integrates the on-screen notice requirements." 417 F. Supp. 2d at 190.

The Court should enter partial summary judgment on the "wrongful verb" claim.

## II.    THE COURT SHOULD ENTER PARTIAL SUMMARY JUDGMENT ON DEFENDANT'S TENTH AFFIRMATIVE DEFENSE—THE EFTA "CAP"

Bank of America seeks partial summary judgment on its tenth affirmative defense, establishing that pursuant to 15 U.S.C. § 1693m(a)(1)(B) any monetary recovery must be capped at $500,000. This "cap" affects both Court I (EFTA) and the state law claims (Counts II and III).

### A.    Plaintiffs Do Not Dispute That The EFTA Count Is Capped at $500,000.

The first issue concerns whether there is a single $500,000 "cap" for purposes of Plaintiffs' EFTA claim (Count One).[5] Plaintiffs do not contest this part of the Bank's motion. Consequently, this Court should order that Count I is capped at $500,000.

### B.    Plaintiffs' Second and Third Counts Are Subject to the Same $500,000 Cap.

As to Count Three, the California claim, Plaintiffs contend it is un-capped. They are wrong. This issue was already decided in *Hazelaar I.*

After presiding over a bifurcated "trial" on precisely this issue, Judge Kramer ruled that "any state law basis for an award of Other Recovery in excess of the EFTA cap in 15 U.S.C. § 1693m(2)(B) is preempted by 15 U.S.C. § 1693q." *Hazelaar v. Bank of America*, No. CGC 03 420611 (Decision on Phase I Trial Issues, p. 8 [Jan. 19, 2005] ["*Hazelaar I*"].) "Other Recovery" was a term he defined that excludes recovery for actual damages and attorneys' fees.[6]

Plaintiffs ask this Court to decline to follow *Hazelaar I.* (Response at 9-10.) But *Hazelaar I* was not "wrongly decided." Judge Kramer undertook a careful analysis of the purpose behind the EFTA cap and concluded that it served the same purpose as the identically-worded TILA "cap," namely, to "advance[e] the rights of class action litigants [while] protect[ing] financial services institutions from ruinous exposure for violations of the statute."

---

[5] The EFTA provides: "[T]he total recovery under this subparagraph *in any class action or series of class actions arising out of the same failure to comply by the same person* shall not be more than … $500,000." 15 U.S.C. § 1693m(a)(1)(B) (italics added).

[6] *Hazelaar I*, p. 6.

*Id.*, pp. 6-7.  He then considered "whether this [federal] policy was meant to preempt states from imposing additional financial liability upon class action defendants upon further or different theories of recovery."  *Id.*  In particular, he had to decide whether "un-capped" state law recovery *for the same EFTA violations* is "inconsistent" with federal policy.  If it is, he reasoned, the EFTA preempts "inconsistent" state law.  15 U.S.C. § 1693q.

Plaintiff, on the other hand, cited the second sentence of Section 1693q, which provides that a "state law is not inconsistent … if the protection such law affords any consumer is greater than the protection afforded by [EFTA]…."  The issue, then, was which side's interpretation of Section 1693q was the better reasoned.

Judge Kramer concluded that "defendant's position is the sounder of the two competing interpretations."  He held:

> Using the common usage of the words of [§ 1693q], it does not seem that a state law affording higher Other Recovery would constitute "greater protection" to the consumers. … [S]uch consumers would be entitled to recover their actual damages without regard to a cap and the amount of costs and attorneys' fees would likewise not be capped....  [Under plaintiff's interpretation], [i]t may be greater money, but it is not greater consumer protection.

*Hazelaar I*, pp. 7-8.

Plaintiffs' argument in this case is the same one that Judge Kramer rejected in *Hazelaar*.  On the consumer-protection side of the ledger, Congress has determined that adequate consumer protection arises from the expansive remedies that EFTA already affords:  (i) Capped statutory damages, (ii) un-capped actual damages, and (iii) attorneys' fees and costs.  On the other side of the ledger, however, "ruinous exposure" would result to defendants if the "cap" on statutory damages could be subverted by repleading the EFTA claim under *un*-capped state law.  Consequently, Judge Kramer determined that allowing un-capped recovery under state law is precisely the sort of "ruinous exposure" that Congress legislated against when it devised the cap, hence, such a claim is preempted by the first sentence of Section 1693q as "inconsistent" with the EFTA.

Here, Plaintiffs confuse "greater money" with "greater consumer protection." This Court should not make the same mistake.

Second, Judge Kramer's analysis ought to be more than usually persuasive. The *Hazelaar* class and the putative California subclass in this case are congruent. In fact, Stephen Kawelti is a member of the *Hazelaar* class, as defined in that case. This Court should not decide differently the same issue—in essentially the same case—even if it wanted to disagree. Here, the same California class members whose Section 17200 claim has been capped at $500,000 by a state court judge would be allowed to find a new plaintiff and escape that determination by re-filing in federal court. Permitting that would offend comity and interfere with the ongoing state court litigation. *Cf.*, *Diva's, Inc. v. City of Bangor*, 411 F.3d 30, 40 (1st Cir. 2005) [citing *Younger v. Harris*, 401 U.S. 37, 53-54 (1971)].

As to Count Two, the Chapter 93A claim, the same analysis obtains. Plaintiffs disagree, and cite *Barnes v. Fleet National Bank*, 370 F.3d 164, 171 (1st Cir. 2004). But *Barnes* never addresses the "cap" issue. It simply holds that because summary judgment in favor of the bank was being reversed as to plaintiff's EFTA claim, it followed that summary judgment against plaintiff on her purely derivative Chapter 93A claim would also be reversed. *Barnes* never raises the issue of the EFTA cap or EFTA preemption, and it never cites Section 1693q.

This Court should grant partial summary judgment on Defendant's tenth affirmative defense. Any monetary relief Plaintiffs seek under Section 17200 or Chapter 93A is limited in the aggregate to the EFTA limit of $500,000, and may not exceed that cap.

## III.    BANK OF AMERICA IS ENTITLED TO SUMMARY JUDGMENT ON ITS NINTH AFFIRMATIVE DEFENSE

### A.    The EFTA Claim Fails Due to Lack of Detrimental Reliance.

The Bank has shown that the EFTA provision allowing recovery of "actual damages" requires proof of detrimental reliance and that the identical "as a result of" language in the TILA requires that Plaintiffs must prove detrimental reliance. Plaintiffs cannot prove reliance.

It is undisputed that every putative class member clicked "yes" when informed of the fee on the click-through screen and prompted, "Do you wish to continue?" (Response to SMF, p. 4 (Item 4).) Given that admission, plaintiffs cannot prove detrimental reliance *even assuming a violation of EFTA*, i.e., even assuming that the Bank's verb choice is wrongful and that its placement of the ATM Decal is not conspicuous.

Plaintiffs' argument to the contrary is legal in nature. They say that TILA cases should not be followed in this EFTA case. (Response, p. 11.) The Third Circuit begs to differ. *Cf. Johnson v. West Suburban Bank*, 225 F.2d 366, 378-79 (3d Cir. 2000). Plaintiffs' argument also runs afoul of the rule that statutes with similar wording and common lineage should be construed *in pari materia. Garrett v. Tandy Corp.*, 295 F.3d 94, 102 (1st Cir. 2002).

Plaintiffs' other response is that because the Bank violated EFTA by having a defective ATM Decal, consumers were damaged. (Response, p. 13.) That is circular. No one disputes that Plaintiffs parted with money, i.e., the surcharge fee. But that does not overcome the separate requirement of "detrimental reliance." Here, after being told of the fee, every class member clicked "yes," thereby instructing the Bank, in effect, "Please charge me." That admission means no class member one parted with money believing—either from the ATM Decal's verb or its placement—that he or she *wouldn't* be charged.[7]

The Court should enter partial summary judgment on this claim.

### B.    Chapter 93A Requires A Showing of Actual Injury.

The fact of the "click-through" screen also destroys Plaintiffs' Chapter 93A argument. Plaintiffs' response is to try to distinguish *Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc.*, 445 Mass. 790, 798-799 (2006) on the ground that Plaintiffs in this case *have* suffered damage—by parting with the surcharge fee—whereas in *Hershenow* the plaintiffs had not.

---

[7] This also answers Plaintiffs' related argument, that the Bank's interpretation somehow renders Section 1693h(a)(d) "superfluous." Response, p. 14. It does not. The EFTA permits both statutory and actual damages. Statutory damages are unqualified. But actual damages must have been incurred "as a result of" the violation. Plaintiffs are confusing the two.

(Response, p. 16.)[8]  But that is just the same circular argument all over again.  It may show "damage," but it doesn't prove "detrimental reliance."  As the *Hershenow* court put it, "causation is a required element of a successful G.L. ch. 93A claim."  *Hershenow*, *supra*, 445 Mass. at pp. 798-99.  Here, the click-through screen negates causation as a matter of law.

The Court should enter summary judgment on Plaintiffs' Second Count.

### C.    California Bus. & Prof. Code § 17200 Requires A Showing of Reliance.

Plaintiffs make the same argument in trying to preserve their "Section 17200" claim, Count III.  (Response, p. 16.)  However, a case decided on July 11, 2006 makes clear that the California sub-class's Section 17200 claim cannot survive as a matter of law.

In *Pfizer, Inc. v. Superior Court*, ___ Cal. 4th ___, 2006 WL 1892581 (July 11, 2006), the California Court of Appeal held that the "as a result of" language of Cal. Bus. & Prof. Code § 17204 "means that [plaintiff] … must have purchased the [product or service] in reliance on the allegedly false or misleading representations or advertisements and as a result suffered injury." (Slip opn., p. 11.)[9]  As noted already, the "click-through" screen means that no class member could have paid the surcharge fee believing he or she would not be surcharged.

The Court should enter summary judgment on Plaintiffs' Third Count.

### CONCLUSION

For all the foregoing reasons, this Court should enter (i) partial summary judgment against the Maryland and California plaintiffs on their "wrongful verb" claim; (ii) partial summary judgment on the Bank's tenth affirmative defense (that all of the Counts are subject to a single $500,000 cap); (iii) partial summary judgment on the EFTA count (Count One) on the ground that "actual damages" are precluded; and (iv) summary judgment on the Second (Chapter

---

[8] It is not true that the Bank's argument is "based entirely" on *Hershenow*.  Defendant also cited *Aspinall v. Philip Morris Cos.*, 442 Mass. 381, 401 (2004), which is to the same effect.

[9] A copy of the Westlaw printout of *Pfizer* is attached to the accompanying Appendix of Out-of-State Cases.

93A) and Third Counts (Section 17200) on the ground that the "click-through" screen precludes

Plaintiffs, as a matter of law, from proving causation and/or reliance.


Dated: July 18, 2006                          BANK OF AMERICA, N.A.

                                              By its attorneys,


                                              /s/ E. Macey Russell
                                              _____

                                              E. Macey Russell, P.C. (BBO #542371)
                                              Robert M. Buchanan, Jr. (BBO #545910)
                                              Choate, Hall & Stewart, LLP
                                              Two International Place
                                              Boston, MA 02110
                                              Tel.: (617) 248-5000
                                              Fax: (617) 348-4000

                                              William L. Stern (Cal. Bar No. 96105)
                                              *Admitted pro hac vice*
                                              Rebekah Kaufman (Cal. Bar No. 213222)
                                              *Admitted pro hac vice*
                                              Morrison & Foerster LLP
                                              425 Market Street
                                              San Francisco, California 94105-2482
                                              Tel.: (415) 268-7000
                                              Fax: (415) 268-7522


## CERTIFICATE OF SERVICE

I, E. Macey Russell, hereby certify that this document filed through the ECF system will

be sent electronically to the registered participants as identified on the Notice of Electronic Filing

(NEF) on July 18, 2006.


                                      _____/s/ E. Macey Russell_____
                                              E. Macey Russell

4103640v1

IN UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

DOUGLAS S. BROWN, STEPHEN KAWELTI
and JAMES A. PROSSER,

               Plaintiffs,

     v.

BANK OF AMERICA, N.A.,

               Defendant.

Case No. 05-10713-PBS

**[LEAVE TO FILE GRANTED PER
ORDER DATED JULY 12, 2006]**

## DEFENDANT BANK OF AMERICA N.A.'S APPENDIX OF OUT-OF-STATE CASES

     Defendant Bank of America, N.A. respectfully submits this Appendix of Out-of-State

cases, attaching three California cases that are cited in Bank of America's reply memorandum:

| **Tab** | **Case** |
|---|---|
| 1 | *Hazelaar I*<br><br>(*Hazelaar v. Bank of America*, No. CGC 03 420611, Decision on Phase I Trial Issues, [Jan. 19, 2005]) |
| 2 | *Hazelaar II*<br><br>(*Hazelaar v. Bank of America*, No. CGC 03-420622, Tentative Statement of Decision on Phase II Trial Issues [April 17, 2006]) |
| 3 | *Pfizer, Inc. v. Superior Court*, ___ Cal. 4th ___, 2006 WL 1892581 (July 11, 2006) |

Dated: July 18, 2006                          BANK OF AMERICA, N.A.

                                              By its attorneys,


                                              /s/ E. Macey Russell
                                              _____

                                              E. Macey Russell, P.C. (BBO #542371)
                                              Robert M. Buchanan, Jr. (BBO #545910)
                                              Choate, Hall & Stewart, LLP
                                              Two International Place
                                              Boston, MA 02110
                                              Tel.: (617) 248-5000
                                              Fax: (617) 348-4000

                                              William L. Stern (Cal. Bar No. 96105)
                                              *Admitted pro hac vice*
                                              Rebekah Kaufman (Cal. Bar No. 213222)
                                              *Admitted pro hac vice*
                                              Morrison & Foerster LLP
                                              425 Market Street
                                              San Francisco, California 94105-2482
                                              Tel.: (415) 268-7000
                                              Fax: (415) 268-7522


## CERTIFICATE OF SERVICE

I, E. Macey Russell, hereby certify that this document filed through the ECF system will

be sent electronically to the registered participants as identified on the Notice of Electronic Filing

(NEF) on July 18, 2006.


                          /s/ E. Macey Russell
                          _____
                          E. Macey Russell

ONE

FILED

San Francisco County Superior Court

JAN 1 9 2005

GOR~~~~~~~~~, Clerk

BY: _____
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

|  |  |
|---|---|
| JANNY HAZELAAR, on behalf of herself and all others similarly situated, and on behalf of the general public,<br><br>Plaintiffs,<br><br>vs.<br><br>BANK OF AMERICA, N.A., WELLS FARGO BANK, BANK OF THE WEST, US BANK, E TRADE BANK, DOES 1 through 600, inclusive,<br><br>Defendants. | Case No.: CGC-03-420622<br><br>DECISION ON PHASE I TRIAL ISSUES |

INTRODUCTION

This action is brought by the plaintiff against the four defendant

banks, alleging that each violated California Business and Professions Code

§§ 17200 and 17500 ["the UCL"] by charging fees to non-bank customers for

various ATM machine services without properly giving notice of such charges.

The named plaintiff asserts her claims against defendant Bank of America as a

class action and against the other defendant banks as a "private Attorney

General" on behalf of the general public. In part, plaintiff claims that

DECISION ON PHASE I TRIAL ISSUES - 1

1  violation of the UCL by the defendants is based upon the federal Electronic

2  Funds Transfer Act, 15 U.S.C. § 1693 [the "EFTA"].

3      Pursuant to the parties' stipulation, the following two issues were

4  presented to this court in a bifurcated trial:

5          1. Whether the monetary claims in the First Amended Complaint are

6              limited under the EFTA to $500,000.00 per defendant.

7          2. What statute of limitations applies to the claims asserted and

8              whether regardless of the statute of limitations, plaintiff is

9              barred from seeking relief for conduct occurring prior to the

10             October 1, 2001 effective date of 12 C.F.R. § 205.16(b).

11     The matters were fully briefed and presented, with further briefing

12 submitted pursuant to this court's order. As is set forth below, this court

13 concludes the following:

14         1. Each defendant's liability in this case for monetary relief that is

15             not actual damages, costs or attorney's fees is capped at $500,000

16             or 1 per centum of such defendant's net worth.

17         2. The applicable statute of limitations for all claims in this case is

18             one-year. Any issue regarding the effect of the enactment of

19             regulations under EFTA is deferred for further proceedings, if

20             appropriate.

21     Each conclusion is discussed below.

22                          THE CAP UNDER THE EFTA

23     Pursuant to their Stipulation Re: Bifurcation and Mini Trial, filed

24 herein on December 24, 2003 ["the Stipulation"] the parties have stipulated

25 that this court accept the following:

              A. For the purposes of the First Amended Complaint, references to the
              "law" that plaintiff contends defendants violated shall mean 15

                          DECISION ON PHASE I TRIAL ISSUES - 2

U.S.C. § 1693b(d)(3)(A)(i),(ii); § 1693b(d)(3)(B)(i),(ii); § 1693b(d)(3)(C)(i),(ii), the Regulations promulgated by the Federal Reserve Board pursuant to 15 U.S.C. § 1693b, codified at 12 C.F.R. § 205.16 and § 205.17; California Business and Professions Code §§ 17200 and 17500, and California Fin. Code § 13080. Defendants rely on 15 U.S.C. § 1693m(a); 15 U.S.C. § 1693m(b)(2); § 1693m(g); § 1693b(d)(3)(A)(1); § 1693q; and C.F.R. § 205.12(e)(2). The parties reserve the right to correct any inadvertent errors in the citations listed above.

B. Plaintiff prays for amounts in excess of $500,000.00 per each defendant. In the case of Wells Fargo Bank and Bank of America, for example, plaintiff seeks an order requiring each bank to disgorge all profits obtained as a result of the alleged unfair practices in the amount of $10,000,000.00. Plaintiff does not agree that the $10,000,000 figure is a floor or ceiling on the recovery she seeks. The actual amount is not ascertained.

While the parties characterize these matters as "facts," they are a combination of facts and legal contentions. For purposes of this bifurcated trial, however, all that need be accepted from the Stipulation relative to facts is that plaintiff's claim for violation of the "illegal" prong of the UCL is at least in part based on alleged violation of the EFTA and that the plaintiff's monetary claim against each defendant exceeds $500,000. Plaintiff has stated that this stipulation does not limit her to claiming violations of the UCL based upon the "unfair" or "deceptive" prongs of the UCL and that the unlawful prong might also be supported by violations of California statutes.

The first question to be resolved involves the interaction of the EFTA cap and the UCL. The EFTA provides for three types of monetary recovery:

...any person who fails to comply with any provision of this subchapter with respect to any consumer...is liable to such consumer in an amount equal to the sum of --
(1) any actual damage sustained by such consumer as a result of such failure
(2)(A) in the case of an individual action, an amount not less than $100 nor greater than $1000; or
(B) in the case of a class action[1], such amount as the court may allow, except that (i) as to each class member no minimum recovery shall be applicable, and (ii) the total recovery under this

---

[1] This case combines a class action and a private Attorney General Actions. The parties have not argued that there is any distinction between the two forms of representative claims for the purposes of this alleged cap. This court sees no basis for making any such distinction.

DECISION ON PHASE I TRIAL ISSUES - 3

1    subparagraph in any class action or series of class actions arising out
     of the same failure to comply by the same person shall be not more than
2    the lesser of $500,000 or 1 per centum of the net worth of the
     defendant; and
3    (3)...the costs of the action, together with reasonable attorney's fees
     as determined by the court.

4    15 U.S.C. § 1693m.

5        The specific question presented is whether this section limits the

6    amount of monetary relief available to the plaintiffs in this case in any

7    way. The alleged offending behavior in this case is claimed to be a violation

8    of EFTA, thus giving rise to potential liability under the "illegal" prong of

     the UCL. That same behavior is also claimed to be "unfair" and "deceptive" so

9    as to invoke liability under those additional prongs of the UCL, and also

10   potentially violative of statutes other than the EFTA. Thus, a further

11   iteration of the question presented is whether the EFTA cap also limits the

12   amounts of recovery under these other conceptualizations of the defendants'

13   alleged wrongful activities.

14       There is substantial disagreement between the parties as to the

15   opponent's position relative to this issue. Plaintiff asserts that this case

16   seeks recovery of actual damages [15 U.S.C. § 1693m(1)] plus "penalty

     damages" [15 U.S.C. § 1693m(2)(B)], plus attorneys' fees [15 U.S.C. §

17   1693m(3)]. Plaintiff states that the defendants seek to limit the recovery of

18   the total of the three components to a cap of $500,000 per defendant.

19   Defendants assert that they do not claim that the $500,000 cap would apply to

20   the total of the three damage components. Instead, they concede that the cap

21   in the EFTA would not limit actual damages, but they argue that such

22   conclusion is meaningless here because no actual damages are or could be

23   claimed in this action by the plaintiff because non-restitutionary damages

24   are not permitted under the UCL. Accordingly, defendants assert that all

     damages that are not actual damages, howsoever styled, are limited in the

25   aggregate to the EFTA cap of $500,000 per defendant. Defendants are silent as

DECISION ON PHASE I TRIAL ISSUES - 4

1  to whether the aggregated cap on all damages other than actual damages would
2  include costs and attorneys' fees.
3         Synthesizing these positions, the contentions can be focused into
4  whether the fact that plaintiff's claim is at least in part based upon the
5  EFTA would render the EFTA cap a limit no matter how the UCL violation were
6  to be styled. Plaintiff appears to be arguing that any cap imposed by the
7  EFTA would only apply to claims based on the illegality prong of the UCL and
8  where the claimed illegality is a violation of the EFTA. Defendants assert
9  that the cap under the EFTA would apply to any UCL recovery even where
10 liability is based on the unfair or fraudulent prongs of the UCL or upon some
   other basis for illegality.
11        In a nutshell, the issue is one of preemption: does the EFTA preempt
12 any further recovery that might otherwise be available to the plaintiff under
   the UCL?
13        As a threshold matter, this court's interpretation of EFTA is guided
14 by a number of standards. "In a statutory construction case, the beginning
15 point must be the language of the statute, and when a statute speaks with
16 clarity to an issue, judicial inquiry into the statute's meaning...is
17 finished." *Estate of Cowart v. Nickols Drilling* (1992) 505 U.S. 469, 475.
18 This principle applies when a California state court is asked to interpret a
19 federal statute. *Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 816.
20        Where a statute is ambiguous, it "must be interpreted in accordance
21 with its object and policy." *Sanders v. Jackson* (7th Cir. 1999) 209 F.3d. 998,
22 1002. State courts should look to decisions of the federal courts for
   guidance:
23        While we are not bound by decisions of the lower federal courts, even
24 on federal questions they are persuasive and entitled to great weight.
       Where lower federal precedents are divided or lacking, state courts
       must necessarily make an independent determination of federal law, but
25     where the decisions of the lower federal courts on a federal question
       are 'both numerous and consistent,' we should hesitate to reject their
       authority.

*Etcheverry v. Tri-Ag Service, Inc.* (2000) 22 Cal.4th 316, 320-21.

In the absence of direct case authority, another guide to statutory interpretation is found in the construction of similar terms of other statutes. *Sanders v. Jackson, supra,* 209 F.3d at 1000-02; *American Airlines v. City of San Mateo* (1996) 12 Cal.4th 1110, 1129.

Using the foregoing principles, under the clear language of the EFTA, the subject cap does not apply to actual damages or to costs or attorneys' fees. The parties' divergence of view as to whether actual costs are either sought or recoverable here raises issues not presented for resolution in this phase of the trial. Such will be dealt with at a later time in this case.

As for damages that are not actual damages, costs or attorneys' fees [hereinafter called for convenience "Other Recovery"], the EFTA is equally clear: these items are capped at $500,000 or 1 per centum of the defendant's net worth. It must be determined, however, whether the existence of such a clear cap preempts the award of any higher recovery as may be allowed in this case under the UCL as alleged.

Defendants assert that the EFTA should be read to embody a federal policy that strikes a balance between affording class action remedies for violations of its provisions yet avoid ruinous exposure to financial services defendants, thus making courts less reluctant to certify class actions for such claims. Such a policy has been recognized under federal law for an identical cap that is contained in the Truth in Lending Law [TILA], 15 U.S.C. § 1640(a)(1)(B). *Bowen v. First Family Financial Services, Inc.* (11th Cir. 2003) 233 F.3d 1331, 1337. It is reasonable to conclude that in using the same cap language in the EFTA, Congress intended to implement the same policy as was embodied in the TILA. *Johnson v. West Suburban Bank* (3rd Cir. 2000) 225 F.3d 366, 379.

1    Thus, this court concludes that the cap language in the EFTA reflects a

2    federal policy of advancing the rights of class action litigants with the

3    protections of financial services institutions from ruinous exposure for

4    violations of the statute.

5    The next question is whether this policy was meant to preempt states

6    from imposing additional financial liability upon class action defendants

7    upon further or different theories of recovery. As for such preemption, EFTA

     at 15 U.S.C. § 1693q provides:

8        This subchapter does not annul, alter, or affect the laws of any State
         relating to electronic funds transfers, except to the extent that those
9        laws are inconsistent with the provisions of this subchapter, and then
         only to the extent of the inconsistency. A State law is not
10       inconsistent with this subchapter if the protection such law affords
         any consumer is greater than the protection afforded by this
11       subchapter...

12    The defendants assert that the first sentence of § 1693q constitutes a

13    preemption of state law based monetary recovery in excess of the EFTA cap

14    because any such amount would be inconsistent with the policy for the cap as

15    articulated above. Plaintiff asserts that the second sentence of § 1693q

16    precludes such preemption because any such further monetary recovery would be

17    a greater protection afforded to a consumer than the cap and thus would not

18    be inconsistent with it. There is no known case authority on point.

19    This court concludes that the defendants' position is the sounder of

20    the two competing interpretations. Using the common usage of the words of the

21    statute, it does not seem that a state law affording higher other recovery

22    would constitute "greater protection" to the consumers. As is set forth

23    above, such consumers would be entitled to recover their actual damages

24    without regard to a cap and the amount of costs and attorney's fees would

25    likewise not be capped. Thus, consumers are fully protected for their actual

      damages, costs and attorneys' fees under EFTA. The amount potentially

      recoverable as Other Recovery then would be something further. Whether such

1   amount should be characterized as profit, windfall, or otherwise, it does not

2   seem reasonable to deem it "greater protection" to consumers. It may be

3   greater money, but it is not greater consumer protection.

4       Increased Other Recovery might be viewed as enhancing deterrence: that

5   the more a potential violator could be liable for the less likely it would be

    to violate the EFTA, thus giving additional protection to the consumers.

6   While there may be some logical appeal to this possibility, it would be

7   directly contrary to the articulated legislative purpose of the cap, which,

8   as is set forth above, recognizes that the risk of ruinous exposure would

9   deter courts from certifying consumer class actions. Such a result could

10  hardly be viewed as "greater protection" to consumers.

11      Finally, the cap limitation would apply to any Other Recovery which

12  would be based on the same acts of defendants alleged to violate EFTA, no

13  matter how such acts are cast for the purposes of the UCL. As was stated in

    Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co. (1999) 20

14  Cal.4th 163,182:

15          Although the unfair competition law is sweeping, it is not
        unlimited...If the Legislature has permitted certain conduct or
16      considered a situation and concluded no action should lie, the courts
        may not override that determination...
17      A plaintiff may thus not 'plead around' an 'absolute bar to relief'
        simply by 'recasting the cause of action as one for unfair
18      competition.'...[citation omitted].

19      This rule is equally applicable where the federal legislature has

20  considered the situation regarding behavior covered by EFTA and has imposed a

    limitation on certain recovery rather than an absolute bar to recovery.

21

22      Accordingly, any state law basis for an award of Other Recovery in

    excess of the EFTA cap in 15 U.S.C. § 1693m(2)(B) is preempted by 15 U.S.C.

23  1639q.

24                      THE STATUTE OF LIMITATIONS

25      The parties present two questions for determination here. The first is

    whether the statute of limitations applicable to this case should be the one-

                    DECISION ON PHASE I TRIAL ISSUES - 8

1    year statute under EFTA [15 U.S.C. § 1693m(g)] or the four-year statute under

2    the UCL [Bus. and Prof. Code § 17208].[2]

3          Defendants assert that the UCL's four-year limitations period is

4    longer than the one-year period under EFTA and is thus inconsistent with the

5    EFTA. Thus, defendants claim that the UCL limitations statute is preempted

6    under 15 U.S.C. § 1693q, quoted above. Defendants are correct, both as a

    matter of federal statutory interpretation and of California law.

7         As for statutory interpretation, it is axiomatic that a four-year

8    limitations period is inconsistent with a one year limitations period, and

9    thus under the language of 15 U.S.C. § 1693q the federal limitations applies

10    unless the longer state limitations period affords "greater protection" for

11    consumers.

12         The analysis here is similar to that regarding the cap on Other

13    Recovery. While a longer limitations period may result in more recovery to

    the plaintiff class by reaching further back for damages and Other Recovery,

14    it does not result in more protection for consumers. Put differently, as is

15    stated above, more money for class members is not the same as more protection

16    for consumers.

17         Be that as it may, California law requires the application of the

18    federal limitations period. Several California courts have held that where

19    there is a conflict between a California limitations period and an express

20    federal limitations period, the federal limitations rules apply. *Angeles*

    *Chemical Co. v. Spencer & Jones* (1996) 44 Cal.App.4[th] 112, 125-26;

21    *Professional Collection Consultants v. Hanada* (1997) 53 Cal.App.4[th] 1016,

22    1018; *White v. Moriarity* (1993) 15 Cal.App.4[th] 1290, 1297-98. *See, 3 Witkin*

23    *California Procedure (4th Ed. 2004)* Actions, § 109.

24

25    [2] Section 17208 provides that "[a]ny action to enforce any cause of action
under this chapter shall be commenced within four years after the cause of
action accrued."

DECISION ON PHASE I TRIAL ISSUES - 9

1      In *Cortez v. Purolator Air Filtration Products, Inc.* (2000) 23 Cal.4[th]

2  163, the Court held that the clear meaning of § 17208 was that the UCL's

3  four-year limitations period applies to *any* action brought thereunder,

4  regardless of whether such action was based upon a statute with a shorter

   limitations period. *Id.* at 178-79. *Cortez*, however, dealt with conflicting

5  California statutes rather than a conflict between a California limitations

6  period and a federal limitations period. Thus, *Cortez* does not apply here.

7      Defendants also assert that the applicable limitations period should

8  also be limited to not reach back before October 1, 2001, the date that

9  certain regulations regarding EFTA allegedly went into effect. This

10 contention raises fact and legal questions beyond the scope of Phase I of the

11 trial, and also is likely moot in light of the ruling on the applicable

   statute of limitations made herein.

12                                  CONCLUSION

13     Upon the foregoing, this court concludes:

14     1. Each defendant's liability in this case for monetary relief that is

15        not actual damages, costs or attorneys' fees is capped at $500,000

16        or 1 per centum of such defendant's net worth.

17     2. The applicable statute of limitations for all claims in this case is

18        one-year. Any issue regarding the effect of the enactment of

19        regulations under EFTA is deferred for further proceedings, if

20        appropriate.

21

22 Dated: January 18, 2004

                             Judge of the Superior Court

23

24

25

                           DECISION ON PHASE I TRIAL ISSUES - 10

**Superior Court of California**
County of San Francisco

| | | |
|---|---|---|
| Hazelaar, | | Case Number: 420622 |
| | Plaintiff(s) | |
| vs. | | **CERTIFICATE OF MAILING** |
| Bank of America, Wells Fargo, et al, | | (CCP 1013a (4) ) |
| | Defendant(s) | |

I, Andrea Carney, a Deputy Clerk of the Superior Court of the City and County of San Francisco, certify that I am not a party to the within action.

On January 19, 2005 I served the attached DECISION ON PHASE I TRIAL ISSUES by placing a copy thereof in a sealed envelope, addressed as follows:

William L. Stern
Severson and Werson, P.C.
One Embarcadero Center
26th Floor
San Francisco, Ca 94111

Bruce A. Ericson
PILLSBURY WINTHROP
50 Fremont Street
P.O. Box 7880
San Francisco, CA 94120-7880

Michael Lawson
Steefel, Levitt & Weiss
One Embarcadero Center, 30th Floor
San Francisco, CA 94111

Daniel Berko
Attorney at Law
819 Eddy Street
San Francisco, CA 94109

Donald Rubenstein
Reed, Smith, Crosby, Heafey
2 Embarcadero Center, Suite 2000
San Francisco, CA 94111

Jonathan D. Fink
Buchalter, Nemer, Fields & Younger
601 South Figueroa St., Suite 2400
Los Angeles, CA 90017-5740

and, I then placed the sealed envelopes in the outgoing mail at 400 McAllister Street, San Francisco, CA. 94102 on the date indicated above for collection, attachment of required prepaid postage, and mailing on that date following standard court practices.

Dated: January 19, 2005

GORDON PARK LI, Clerk

By: _Andrea Carney_
Andrea Carney, Deputy Clerk

TWO

**F I L E D**
San Francisco County Superior Court

APR 1 7 2006

GORDON PARK-Li, Clerk
BY: _____
                    Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| JANNY HAZELAAR, on behalf of herself and all others similarly situated, and on behalf of the general public, | No.: CGC 03-420622 |
| Plaintiffs, | TENTATIVE STATEMENT OF DECISION ON PHASE II TRIAL ISSUES |
| vs. | |
| BANK OF AMERICA, N.A. (USA), WELLS FARGO BANK, DOES 1 through 60, inclusive, | |
| Defendants. | |

## INTRODUCTION

Pursuant to the stipulation of the parties, two issues were bifurcated for court trial as Phase II of this case. The first issue is whether notices placed by defendants on their automated teller machines ("ATMs") which state that ATM users "may" be charged a fee for using the machine are unlawful or deceptive under Business & Professions Code section 17200, *et seq.* ("UCL") when in fact some categories of users will be charged a fee while others will not. The second issue is whether the defendants' practice of charging fees for cash withdrawals to cardholders of domestic banks while waiving such fees to cardholders of non-U.S. banks is an unfair discriminatory practice under the UCL.

ISSUE I

DOES THE USE OF "MAY" WITH RESPECT

TO ATM FEES VIOLATE THE UCL?

A. Background Facts

From May 19, 2002 to the present, plaintiff has had a deposit account with Patelco Credit Union and not with either with Bank of America or Wells Fargo. Stipulated Fact 19. During this period, plaintiff made two cash withdrawals from Bank of America ATMs and four from Wells Fargo ATMs. Stipulated Facts 5 and 12. Each time, the only fee that plaintiff was charged for a withdrawal by each bank was $1.50. Stipulated Facts 7 and 14.

1. Bank of America's signage.

Since at least May 19, 2002 to the present, the sign posted on each Bank of America ATM in California has stated that U.S. cardholders may be charged a $1.50 fee for withdrawing cash from a non-Bank of America account in addition to any fees which might be charged by their own financial institution. Stipulated Fact 3; Tr. Exs. 2009, 2011. This sign was posted on the Bank of America ATMs used by the plaintiff. Stipulated Fact 15.

Since at least May 19, 2002, the click-through screen on each Bank of America ATM in California has stated: "Fee Notice, Bank of America, the owner of this ATM, adds an ATM usage fee to cash withdrawals. This fee is in addition to any fee which may be assessed by your financial institution. Fee $1.50. Do you want to continue with this transaction? [Yes. No (Fee not charged)]." Stipulated Fact 4; Tr. Ex. 2012. This screen appeared for the plaintiff when she used each Bank of America ATM, and she clicked "yes" for each of her transactions. Stipulated Fact 17.

2. Wells Fargo's signage.

The sign on each Wells Fargo ATM in California has stated since at least May 19, 2002 to the present:

> Wells Fargo may charge non-Wells Fargo U.S. Cardholders a fee of $1.50 for transactions performed at this ATM. This fee is in addition to any fees charged by your financial institution and will be automatically deducted from your account. Please Note: This fee does not apply to customers using a Wells Fargo or Norwest ATM Card. Questions? Please call 1-800-869-3557.

or

–2–

Wells Fargo U.S. Cardholders will not be charged the following fee when using their Wells Fargo or Norwest ATM Card. Wells Fargo may charge non-Wells Fargo U.S. Cardholders a fee of $1.50 for transactions performed at this ATM. This fee is in addition to any fees charged by your financial institution and will be automatically deducted from your account. Questions? Please call 1-800-869-3557.

Stipulated Fact 1; Tr. Ex. 1001.

At the time that plaintiff made the cash withdrawals from Wells Fargo ATMs, the ATM had a sticker on it stating in part: "Wells Fargo may charge non-Wells Fargo U.S. Cardholders a fee of $1.50 for transactions performed at this ATM." Stipulated Fact 8.

The click-through screen on each Wells Fargo ATM in California has stated, since at least May 19, 2002 to the present, when a non Wells Fargo customer attempts to withdraw cash: "A fee of $1.50 will be charged to your account by Wells Fargo for this transaction. This fee is in addition to fees charged by your financial institution. Do you wish to continue? [No] [Yes]." Stipulated Fact 2; Tr. Ex. 1002. This screen appeared for the plaintiff when she used each Wells Fargo ATM machine, and she clicked "yes" for each of her transactions. Stipulated Fact 10.

3. Defendants' Practices of Waiving ATM Fees

During the period from May 19, 2002 to the present, Bank of America maintained agreements with various financial institutions whereby Bank of America agreed to waive the fee for cash withdrawals as to customers of those institutions. Pre-filed [sic] Direct Testimony of Debora S. Bartoo ("Bartoo Direct"), filed on November 30, 2005, at 4:1-4. Under these agreements, customers of the following banks were not charged a fee for using ATMs in California to make cash withdrawals: Bank of the Commonwealth (since prior to 2002); Valero Credit Union (since approximately October 2002); Fleet (from approximately April 2004 until Fleet's merger with Bank of America was completed); Bristol County Savings Bank (since approximately September 2004); and Mechanics Savings Bank (since approximately February 2005). Bartoo Direct at 4:5-10.

During the period from May 19, 2002 to the present, Wells Fargo waived surcharges for cash withdrawals for the following categories of non-Wells Fargo customers using Wells Fargo ATMs in California:

(i)     "Merger customers." Wells Fargo does not surcharge customers of another bank for cash withdrawals made at a Wells Fargo ATM using the merged bank's card. The

-3-

1  fee-waiver begins after the merger agreement is finalized and the regulators have approved

2  the merger, and lasts until the time the former customers of the merged bank get rebranded

3  with a new Wells Fargo card.

4      (ii)    "Corporate sites." Wells Fargo operates ATMs at certain corporate campuses

5  in California. For some of those locations, Wells Fargo has entered into agreements with the

6  corporate customer not to surcharge at ATMs located on those sites.

7      (iii)    "International" transactions. Wells Fargo does not surcharge international

8  transactions, i.e., cards issued by a bank headquartered outside the United States.

9      (iv)    "Electronic Benefits Transactions" ("EBTs"): Recipients of government

10  benefits receive their government payments through a stored-value card, which they may use

11  to withdraw cash at an ATM. For recipients of EBTs who live in Arizona and Minnesota,

12  Wells Fargo does not charge a surcharge for cash withdrawals made at a California ATM

13  with one of those EBT cards.

14      (v)    "Correspondent Banks." Wells Fargo does not charge a fee for cash

15  withdrawals made by customers of banks with whom Wells Fargo has entered into a bilateral

16  contract (i.e., a written reciprocity agreement whereby Wells Fargo will not surcharge the

17  other bank's customers and the other bank will not surcharge Wells Fargo's customers).

18  Stipulated Fact 26.

19      From May 19, 2002 until October 25, 2005, Wells Fargo Bank waived the surcharge for

20  2,032,946 of approximately 47.5 million ATM transactions. Stipulated Fact 27.

21                          B. Analysis

22      The UCL prohibits any business practice that is "unlawful, unfair or fraudulent." Cal. Bus &

23  Prof. Code § 17200. Rather than prohibiting specified practices, this broad statutory language was

24  intentionally framed to allow courts to deal with the innumerable business schemes which the

25  fertility of man's invention and chicanery might contrive. *Cel-Tech Communications, Inc. v. Los*

26  *Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 181. The three categories of inappropriate

27  business practices are disjunctive, and thus a violation of the UCL can occur if the questioned

28  practice is found to be either unlawful or unfair or fraudulent. *Id.* at 180. In evaluating a claim of

—4—
TENTATIVE DECISION ON PHASE II TRIAL ISSUES

1  violation of the UCL, the court must look at each prong of the UCL to determine whether the

2  plaintiff has shown the practice to be either unlawful or unfair or deceptive. *Walker v. Countrywide*

3  *Home Loans* (2002) 98 Cal.App.4th 1158, 1169-70.

4        Accordingly, the use of the term "may" by the defendants with reference to their ATM fees

5  must be evaluated under each of the three prongs of the UCL.

6        1. Is the defendants' use of the word "may" with respect to the ATM charges unlawful?

7        A business practice is "unlawful" for purposes of the UCL if it is forbidden by law. *Farmers*

8  *Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 383. The UCL "borrows" violations of other

9  laws and treats these violations, when committed pursuant to business activities, as unlawful

10  business practices under the UCL. *Id.* In this case, plaintiff claims that the use of "may" violates the

11  Electronic Funds Transfer Act, a federal law regarding ATM machine notices. A violation of federal

12  law may serve as a predicate for a UCL action under its unlawful prong. *Roskind v. Morgan Stanley*

13  *Dean Witter & Co.* (2000) 80 Cal.App.4th 345, 352.

14        The Electronic Funds Transfer Act, 15 U.S.C. §§ 1693, *et seq.* ("EFTA"), requires ATM

15  operators who impose a fee on any consumer for ATM services provided to that consumer to place a

16  fee disclosure at or on their ATMs. 15 U.S.C. § 1693b(d)(3). The disclosure must provide notice to

17  the consumer of "the fact that a fee is imposed" and "the amount of any such fee." 15 U.S.C.

18  § 1693b(d)(3)(A)(i)-(ii).

19        Congress expressly directed the Federal Reserve Board ("Board") to prescribe regulations to

20  carry out the purposes of the EFTA, and provided that any such regulations "may contain such

21  classifications, differentiations, or other provisions, and may provide for such adjustments and

22  exceptions for any class of electronic fund transfers, as in the judgment of the Board are necessary

23  and proper to effectuate the purposes of [the EFTA]." 15 U.S.C. § 1693b(a), (c). Regulation E,

24  enacted pursuant to that mandate, does not require ATM operators to use any particular verb on their

25  ATM stickers. Rather, Regulation E states that any ATM operator who imposes a fee for electronic

26  fund transfers shall provide "notice that a fee will be imposed ... [and] disclose the amount of the

27  fee." 12 C.F.R. § 205.16(b).

28

-5-

**TENTATIVE DECISION ON PHASE II TRIAL ISSUES**

1       On February 9, 2006, amendments to subsection (c) of Regulation E became effective, which

2  further provide that ATM operators may meet the requirements of Regulation E by posting a notice

3  that "[a] fee *may be imposed* for providing electronic fund transfer services or for a balance inquiry,

4  but ... only if there are circumstances under which a fee will not be imposed for such services." 12

5  C.F.R. § 205.16(c)(1)(ii) (*emphasis added*).

6       The Board expressly characterizes the amendments to Regulation E as a clarification of

7  existing law. 70 F.R. 49891 (publishing proposed amendments for comment); *see also First Nat'l*

8  *Bank of Chicago v. Standard Bank & Trust*, (7th Cir. 1999) 172 F. 2d 472, 478 (deference is due to

9  an agency's pronouncement "that its intention in issuing [a] regulation was to clarify rather than

10  change existing law."). In publishing the amendments for comment, the Board stated that the sticker

11  notice "is intended to allow consumers to identify immediately ATMs that generally charge a fee for

12  use," and that it is "not intended to represent a complete disclosure to the consumer regarding the

13  fees associated with the particular type of transaction the consumer seeks to conduct." 70 F.R.

14  49891-49892.

15       Considerable deference must be given to the interpretation given a statute by the officers or

16  agency charged with its administration. *Zenith Radio Corp. v. United States*, (1978) 437 U.S. 443,

17  450. In *Ford Motor Credit Co. v. Milhollin* (1980) 444 U.S. 555, the United State Supreme Court

18  considered the specific issue of deference to the Federal Reserve Board's interpretation of the Truth

19  in Lending Act, 15 U.S.C. §§ 1601, *et seq.* ("TILA"), as reflected in the Board's enactment of

20  Regulation Z (12 C.F.R. 226.1). *Milhollin*, 444 U.S. at 566. Finding that deference to

21  "administrative expertise [was] particularly apt under TILA," because "Congress delegated broad

22  administrative lawmaking power to the Federal Reserve Board when it framed TILA," *Milhollin*

23  held that the Federal Reserve Board's interpretation of TILA should be accepted unless

24  "demonstrably irrational." *Id.* at 565-566.

25       Given that the enabling language of TILA and EFTA is identical – "[t]he Board shall

26  prescribe regulations to carry out the purposes of this subchapter," 15 U.S.C. §§ 1604(a), 1693b(a) –

27  the same deference recommended by the Supreme Court in *Milhollin* is due the Board's recent

28  amendments to Regulation E. As the U.S. Supreme Court noted, "[t]he Act is best construed by

1  those who gave it substance in promulgating regulations thereunder." *Milhollin*, 444 U.S. at 566.

2  The Court finds that the amendments to Regulation E are not demonstrably irrational, are entitled to

3  great deference, and state the law as it existed under EFTA and Regulation E during the class period

4  at issue here.

5       Viewed in light of the amendments to Regulation E, this court finds that the Bank of America

6  and Wells Fargo sticker notices are lawful. The notices inform users of the ATMs that fees are

7  generally charged to non-customers who use those ATMs for certain services. 15 U.S.C. §

8  1693b(d)(3); 12 C.F.R. § 205.16(c)(1)(ii). Moreover, because circumstances exist under which Bank

9  of America and Wells Fargo waive fees as to non-customers, the use of "may" on the notices is

10  expressly permitted. 12 C.F.R. § 205.16(c)(1)(ii).

11       Finally, even if Regulation E did not expressly state that use of "may" is permissible under

12  the EFTA, this court finds that Bank of America's and Wells Fargo's posted sign notices are

13  nonetheless lawful under the plain language of the EFTA. The EFTA does not provide that any

14  particular verb must be used in the disclosure. Instead, all the EFTA requires is that the disclosure

15  generally notify consumers that a fee "is" imposed by the ATM operator for certain services. 15

16  U.S.C. § 1693b(d)(3)(A)(i)-(ii) (an ATM operator must provide notice to the consumer of "the fact

17  that a fee is imposed"). This court finds that the defendants' ATM sticker notices comply with this

18  requirement.

19       The plaintiff does not contend that the defendants' use of "may" in their ATM signs violates

20  any other applicable law. Thus, this court finds that defendants' use of "may" in their notices are

21  lawful and do not violate the unlawful prong of the UCL.

22       2. Is the defendants' use of the word "may" with respect to the ATM charges unfair?

23       In *Walker v. Countrywide Home Loans, Inc., supra*, 98 Cal.App.4[th] at 1170, the Court

24  discussed the test for determining whether a business practice is unfair under the UCL:

25

26

27

28

–7–

**TENTATIVE DECISION ON PHASE II TRIAL ISSUES**

1  No clear test to determine what constitutes an unfair business practice has been established in
   California. One court has said that an unfair business practice is one that 'offends an

2  established public policy or when the practice is immoral, unethical, oppressive,
   unscrupulous or substantially injurious to consumers...'[citation omitted], and another court

3  has stated that to determine whether a business practice is unfair, courts must 'weigh the
   utility of the defendant's conduct against the gravity of the harm to the alleged

4  victim...'[citation omitted]. The California Supreme Court criticized these tests as being 'too
   amorphous and provid[ing] too little guidance to courts and businesses,' but declined to

5  formulate a test for consumer actions ...[citation to *Cel-Tech Communications, Inc. v. Los*

6  *Angeles Cellular Telephone Co., supra,* 20 Cal.4th at 185 omitted].

7

8      Whether the criticism of the two "amorphous" tests by *Cel-Tech* means that they should not

9  be applied has been the topic in cases after *Cel-Tech*. In *Walker*, the Court analyzed both pre-*Cel*

10  *Tech* tests set forth above and determined that under either, the business practice before it was fair.

11  Accordingly, the Court stated that it did not have to decide which of the two tests applied.

12      In *Schnall v. Hertz Corp* . (2000) 78 Cal.App.4th 1144, the Court stated that Cel-Tech

13  suggested that the claimed unfairness of a business practice "must be tethered to some legislatively

14  declared policy," but also went on to state that "unfairness" is an equitable concept that necessarily

15  must involve an examination of the impact of the conduct as balanced with the justifications offered.

16  *Id.* at 1166-67.

17      In *Progressive West Ins. Co. v. Superior Court* (2005) 135 Cal.App.4th 263, the Court

18  discussed whether *Cel-Tech* had somehow rejected the two tests recognized in *Walker*. The

19  *Progressive* Court looked at the language of *Cel-Tech*, which expressly stated it was not setting forth

20  a new test for "unfair" in consumer cases, and also noted that the Supreme Court has not articulated

21  a different test in six years since its criticism in *Cel-Tech*. Thus, *Progressive* decided that the

22  appropriate test to apply would be the balancing test, which it declined to do because the case was

23  still in the demurrer stage. *Id.* at 285-87.

24      Like the courts in the cases above, this court need not make a precise determination as to

25  what the appropriate test for "fairness" is under the UCL because however one looks at the use of the

26  word "may" on the signs affixed to defendants' ATMs, that practice is fair. Using the balancing test

27  first, the signs in question are visible to any potential user of the defendants' ATMs. Under the

28  defendants' policies regarding who will be charged for using the ATMs, every potential user falls

– 8 –

1   into one of two categories. The first category is those people who will be charged a fee for using the

2   ATM and the second category is those people who will not be charged a fee. Since the sign is

3   inanimate and not interactive, it has no way of determining which category a potential ATM user

4   reading the sign falls into. Redacted Prefiled [sic] Direct Testimony of John Nicholson, filed

5   December 6, 2006, ("Nicholson Direct") at 12:21-27. Thus, by reciting that the reader "may" be

6   charged a fee, the sign is completely accurate and conveys the truth. Thereafter, the potential user

7   puts his or her ATM card into the machine, which reads the information on it and then makes the

8   determination as to whether the user falls into the category of those who get charged the fee.

9   Nicholson Direct at 12:21-27. If so, the screen states that the user will be subject to a specified fee

10  and allows him or her to choose to discontinue use of the machine and thus not incur the fee. Again,

11  the information provided is accurate and truthful.

12        From the consumer's perspective, then, he or she is twice told the truth regarding ATM fees

13  and is given the opportunity to avoid incurring them. The plaintiff has not met her burden of proving

14  that in the context of this case, being told the truth and being given the opportunity to avoid the

15  ATM fee is immoral, unethical or unscrupulous. Further, while the user must insert his or her ATM

16  card and interact somewhat with the machine before learning that a fee will be imposed, the fee can

17  then be readily avoided by selecting to discontinue use of the ATM. Thus, plaintiff has failed to meet

18  her burden of proof that such interaction with the ATM is oppressive, burdensome or substantially

19  injurious to the consumer.

20        To be sure, the need to interact with the ATM could possibly be avoided if the sign on the

21  machine stated who would and who would not be subject to a fee, but the inconvenience in terms of

22  both time and effort of inserting one's card and punching a few buttons is minimal. In addition, all

23  but the least inductive thinkers would readily learn after one or two uses that a fee would be charged

24  when using an ATM not operated by his or her bank. Thus, it is not likely that consumers will

25  repeatedly have to insert their cards to see if this time they will be charged a fee for using another

26  bank's ATM.

27        The defendants offered unrefuted, credible evidence that their policies regarding who is

28  exempt from paying ATM fees change periodically, sometimes on a temporary basis (e.g., a waiver

-9-

TENTATIVE DECISION ON PHASE II TRIAL ISSUES

1   for Hurricane Katrina victims). Bartoo Direct at 6:6-13; Nicholson Direct 17:13-21. Changing

2   stickers on their ATM machines to reflect changes in ATM fee exemptions would be very costly and

3   would take a long time to accomplish. Bartoo Direct, 7:1-8; Nicholson Direct, 17:22-17:3. By using

4   the word "may" instead of "shall" with a list of those who will be charged, the defendants are able to

5   have flexibility in their ATM fee exemption policy without incurring burdensome costs each time an

6   exemption is changed. Id.

7           In addition, defendants' evidence demonstrated another business reason for using the word

8   "may" with respect to ATM charges. Each defendant, along with other similar lenders, are members

9   of the Star ATM Network. Stipulated Fact 33. The Star Network requires that its members follow

10  rules as a condition of membership. The rules require the use of the word "may" with reference to

11  the ATM charges. Nicholson Direct at 10:28-11. Each defendant complies with these rules in order

12  to obtain the benefits of network membership for its customers. Bartoo Direct at 7:25-26, Nicholson

13  Direct at 10:22-11:4 and 13:2- 14:14; Tr. Ex 1003.

14          When these business reasons established by the defendants are balanced against the minimal

15  effects on consumers from having to interact with the ATM as is set forth above, it cannot be said

16  that the use of "may" is unfair to the consumer. Thus, under the balancing test, it does not appear

17  that the use of "may" is unfair.

18          Under the alternative tests in the cases discussed above, plaintiff has not met her burden of

19  proof. There has been no showing that the defendants' practices offends some established California

20  public policy or is somehow tethered to some legislatively declared policy.

21          Finally, there is further authority that provides a simpler analysis of whether defendants'

22  practices are unfair under UCL. In *Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, the challenged

23  business practice was age-based fee surcharges for car rentals. The court first determined that these

24  surcharges did not violate any law. It then turned to whether they were unfair and held that "a

25  business practice cannot be unfair if it is permitted by law." *Id.* at 1505. Under this analysis, the

26  failure of the plaintiff to demonstrate that the defendants' practices are unlawful precludes a finding

27  that these practices are unfair.

28          Upon the foregoing, the defendants' practices are not unfair under the UCL.

TENTATIVE DECISION ON PHASE II TRIAL ISSUES

3. Is the defendants' use of the word "may" with respect to the ATM charges deceptive?

The third prong of the UCL is that the questioned practice is deceptive. In order to establish that a business practice is deceptive, the plaintiff need only show that members of the public are likely to be deceived. *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 211. This means that unlike common law fraud, a violation of the UCL can be shown even if no one was actually deceived, relied upon the fraudulent practice or sustained any damage. *Id.*

Plaintiff asserts that the use of "may" is deceptive and misleading because as for users of the ATM who are in the category of those to be charged a fee, these people *will* be charged. Plaintiff points out that while "may" might be technically accurate, it is less than complete. Plaintiff cites *Day v. A.T. & T Corp.* (1998) 63 Cal.App.4th 325, which holds that "[b]y their breadth, the [UCL] statutes encompass not only those advertisements have deceived or misled because they are untrue, but also those which may be accurate on some level, but will nonetheless tend to mislead or deceive." *Id.* at 332. *Day* dealt with the sufficiency of the allegation of the complaint under the UCL. As alleged, the defendant phone company sold prepaid phone cards that allowed the buyer to pay for long distance telephone calls in advance. It was further alleged that the practice of the defendant was to round the time of each call paid for by the cards up to the next whole minute and that the packaging of the product did not disclose this. The Court of Appeal held that this could be deceptive and thus reversed the sustaining of the demurrer by the trial court. Thus, it was the absence of explanation of a key factor as what was "prepaid" that formed the likelihood of deception, at least for purposes of allowing the suit to go forward.

In *Day*, then, the problem for consumers was that while they might believe they were prepaying for their calls (which was true), they were also paying more for their calls due to the rounding up of minutes, and they had no way of knowing this until after they bought the cards. The defendant in *Day*, however, obviously knew of its practice and thus could potentially be seen to be deceitful by not disclosing this to the consumer until after the card was purchased. The essence of

1    the problem is that the consumer must pay buy the phone card before finding out the truth as to what

2    it covers, which truth is known to the defendant before the purchase is made.

3        The present case does not fit into this format. Here, the statement that the reader of the fixed

4    ATM sign "may" be charged a fee is directed to both those who will pay a fee and those who will

5    not pay a fee. Thus, the word "may" accurately alerts all users of the ATM of the potential of a fee.

6    It does not omit any fact known to the defendants as to the individual user because the user must

7    place his or her card in the machine for the defendant (actually, its machine) to know whether the fee

8    will be charged to that particular person. At that point, a further disclosure as to whether the fee will

9    be charged is made, and the user is given the opportunity to avoid engaging in the business

10   transaction with the defendant. The consumer is presented with all pertinent facts at the time these

11   facts become known to the defendant and before the consumer incurs the fee.

12       Once again, there is the potential that the ATM signs could recite all factors which determine

13   whether a fee will be charges, and then the signs could say that the fee will be charged unless the

14   user fits into an exemption. As is stated above, however, the defendants have legitimate business

15   reasons for not using such signs. In addition, since consumers do not incur the fee until after the

16   further on-screen disclosure and the consumer specifically elects to pay the fee, it cannot be said that

17   the fixed signs deceive the consumer into doing anything except taking the next step of finding out if

18   they will be charged a fee for using the machine. Nothing is purchased as a result of the fixed signs,

19   and the plaintiff failed to demonstrate any other tangible proof of deception of the public from the

20   signs.

21       Thus, the defendants' use of "may" on their fixed ATM signs is not deceptive under the

22   UCL.

### ISSUE II

### IS DEFENDANTS' WAIVER OF SURCHARGE FEES TO

### CARDHOLDERS OF NON - U.S. BANKS AN UNFAIR BUSINESS PRACTICE?

#### A. Background Facts

27   The network rules of Visa, MasterCard and Plus provide that their members may not

28   surcharge cardholders of banks located outside of the United States unless state law expressly

~ 12 ~

TENTATIVE DECISION ON PHASE II TRIAL ISSUES

1  requires that an ATM operator be permitted to impose surcharges to such cardmembers. Stipulated

2  Fact 48.

3      At all times during the class period and up to the present time, defendants did not impose

4  surcharges on cash withdrawals made by persons who hold ATM cards issued by a bank located

5  outside of the United States regardless of whether the person is a U.S. citizen or a citizen of a foreign

6  country. Stipulated Fact 49.[1] At all times during the class period and up to the present time,

7  defendants imposed surcharges on cash withdrawals (with the exception of certain waiver

8  categories) made by persons who hold ATM cards issued by U.S. banks regardless of whether the

9  person is a citizen of a foreign country. Stipulated Fact 50.

10     The Visa, MasterCard and Plus networks all preclude its members from charging ATM fees

11  to cardholders of banks located out of the United States unless applicable state law expressly

12  requires that the ATM operator be allowed to do so. Stipulated Fact 48. Defendants belong to such

13  networks and believe that as a result of their membership agreements they have been contractually

14  prohibited from charging such fees. Bartoo Direct at 7:17-28, Nicholson Direct at 19:9-19; Tr. Ex

15  1004, 1005 and 1006.[2]

16                                    B. Analysis

17     The plaintiff's argument that defendants' policy of not charging ATM fees on withdrawals

18  using non-U.S. ATM cards is based upon the unfair prong of the UCL. Thus, the legal analysis set

19  forth above applies here. Before turning to this analysis, it must be recognized that the scope of what

20  constitutes an "unfair" business practice under the UCL is not limitless.   When determining whether

21  the challenged conduct is unfair within the meaning of the UCL, "courts may not apply purely

22

23  [1] This court notes that the stipulated fact states no charge is made for cash withdrawals from ATMs by persons who

24  "hold" ATM cards issued by a bank located out of the United States. Missing from the stipulation is that the fee
    surcharge must be upon a withdrawal using that card. The court is allowed to make reasonable inferences from the facts
    presented, and thus makes the inference that the fees are waived only for withdrawals using the non-U.S. bankcard. It

25  would not be reasonable to infer that the waiver applies to all holders of non-U.S. cards even where they use a U.S. bank
    issued card for the cash withdrawal. There is no evidence presented to suggest that where a U.S. issued bank card is used

26  by a customer who also holds a card issued by a non-U.S. bank, the ATM would somehow know what else was in his or
    her wallet.

27  [2] . California Financial Code Section 13083, effective January 1, 2006, may have an effect on these network
    agreements. Any such effect is irrelevant to this case.

28

                                      − 13 −
                     _____
                     **TENTATIVE DECISION ON PHASE II TRIAL ISSUES**

1  subjective notions of fairness" or "impose their own notions of the day as to what is fair or unfair."

2  *Cel-Tech Communications, Inc, v. Los Angeles Cellular Tel. Co., supra,* 20Cal. 4th at 180.

3      Plaintiff's argument concerning the fairness of not charging non-U.S. bank card transactions

4  does not focus on any of the articulated tests in the various cases. Plaintiff does refer to the purpose

5  of the Unruh Act, but does not rely on it as a basis for UCL violation because this court has

6  previously determined that the Unruh Act does not apply to this case. Thus, the purpose of the Unruh

7  Act plays no part in the analysis of the fairness of the subject practice.

8      Using the balancing test described above, this court finds that plaintiff has failed to meet her

9  burden of proof that there is any legally cognizable harm to consumers using U.S. bank ATM cards

10  against which other concepts must be balanced. Plaintiff is not specifically arguing that the fee to

11  customers using U.S. bank ATM cards is itself unfair.  The argument is that the discrimination in

12  favor of non-U.S. bank ATM card withdrawals is unfair. Presumably, charging the foreign carded

13  customers would obviate the claimed unfairness. Plaintiff has offered no convincing authority that

14  this disparate treatment justifies a legal remedy.

15      Additionally, both Bank of America and Wells Fargo have established that they each waive

16  surcharge fees for cardholders of non-U.S. banks in furtherance of a legitimate business purpose

17  relating to membership in various ATM networks.  Based upon this evidence, the business benefit of

18  waiving fees to cardholders of non-U.S. banks presumptively outweighs any perceived harm to

19  consumers.

20      Plaintiff has also failed to meet her burden of proof regarding other tests used to determine

21  fairness under the UCL. There has been no showing that the practice of not charging fees to non-

22  U.S. ATM card users violates some established California public policy or is somehow tethered to

23  some legislatively declared policy.

24      Finally, under *Lazar v. Hertz Corp., supra,* 69 Cal.App.4[th] at 1505, "a business practice

25  cannot be unfair if it is permitted by law." Plaintiff has not met her burden of proof to establish that

26  the subject differentiation is prohibited by some law. To the contrary, the recent enactedly California

27  Financial Code section 13083 prohibits ATM network operators from *requiring* financial institutions

28  to waive surcharge fees for non-U.S. bank cardholders, but does not prevent the ATM operators

— 14 —

**TENTATIVE DECISION ON PHASE II TRIAL ISSUES**

1   themselves from waiving such fees at their own discretion. Fin. Code § 13083 (a), (b). Thus, it

2   appears that it is lawful in California for the defendants to charge ATM fees for withdrawals using

3   U.S. bank issued ATM cards while not charging for withdrawals using non-U.S. bank ATM card.

4        Accordingly, the failure of the plaintiff to demonstrate that the defendants' practices are

5   unlawful precludes a finding that these practices are unfair.

6                                    CONCLUSION

7        Upon the foregoing, this court concludes:

8     1.  Defendants' use of the verb "may" on their respective ATM sticker notices is not a violation

9         of the UCL; and

10    2.  Defendants' practice of charging fees for cash withdrawals to cardholders of domestic banks,

11        while waiving such fees to cardholders of non-U.S. banks, is not an unfair practice in

12        violation of the unfair business practices prong of the UCL.

13                               FURTHER PROCEEDINGS

14   No later than May 10, 2006, the parties may file and serve proposed revisions to this

15   Tentative Decision. Such proposed revisions shall not reargue the substance of the matters decided

16   but rather shall be limited to drafting, factual or other similar matters.

17        This matter is set for a Case Management Conference at 3:30 p.m. on May 15, 2006. The

18   parties shall file a Joint Case Management Conference Statement five court days before such

19   conference addressing what is to be done next in this case, including the phasing of additional issues

20   for resolution and the conducting of discovery, if any, appropriate to the presentation of such issues.

21   /

22   /

23   /

24   /

25   /

26   /

27   /

28

                                  – 15 –

1    The parties are ordered to meet and confer before preparing the Joint Case Management Conference

2    Statement.

3
        Any proposed revisions to this Tentative Decision and the next activities for this case will be
4
5    discussed at the Case Management Conference.

6

7
     DATED: April 17, 2006
8

9                                    _____
                                        Judge of the Superior Court
10
                                        RICHARD A. KRAMER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        – 16 –

# Superior Court of California
## County of San Francisco

Hazelaar,

      vs.

                    Plaintiff(s)

Bank of America, Wells Fargo, et al,

                    Defendant(s)

Case Number: 420622

**CERTIFICATE OF MAILING**
(CCP 1013a (4) )

I, Jose Rios-Merida, a Deputy Clerk of the Superior Court of the City and County of San Francisco, certify that I am not a party to the within action.

On April 18, 2006, I served the attached TENTATIVE STATEMENT OF DECISION ON PHASE II TRIAL ISSUES by placing a copy thereof in a sealed envelope, addressed as follows:

William Stern
Rebekah Kaufman
MORRISON & FOERSTER, LLP
425 Market Street
San Francisco CA 94105-2482

Bruce A. Ericson
PILLSBURY WINTHROP
50 Fremont Street
P.O. Box 7880
San Francisco, CA 94120-7880

Michael Lawson
Steefel, Levitt & Weiss
One Embarcadero Center, 30th Floor
San Francisco, CA 94111

Donald Rubenstein
Reed, Smith, Crosby, Heafey
2 Embarcadero Center, Suite 2000
San Francisco, CA 94111

Daniel Berko
Attorney at Law
819 Eddy Street
San Francisco, CA 94109

Scott H. Jacobs (Court Call)
REED SMITT, LLP
355 South Grand Avenue, Suite 2900
Los Angeles CA 90071

Jonathan D. Fink
Buchalter, Nemer, Fields & Younger
601 South Figueroa St., Suite 2400
Los Angeles, CA 90017-5740

I then placed the sealed envelopes in the outgoing U. S. mail at 400 McAllister Street, San Francisco, CA. 94102 on the date indicated above for attachment of required prepaid postage, collection and mailing following standard court practices.

Dated: April 18, 2006

GORDON PARK-LI, Clerk

By: _____

Jose Rios-Merida, Deputy Clerk

THREE

Westlaw.

--- Cal.Rptr.3d ---

Page 1

--- Cal.Rptr.3d ---, 2006 WL 1892581 (Cal.App. 2 Dist.)
**(Cite as: --- Cal.Rptr.3d ----)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
Court of Appeal, Second District, Division 3,
California.
PFIZER INC., Petitioner,
v.
SUPERIOR COURT of Los Angeles County,
Respondent;
Steve **Galfano**, Real Party in Interest.
No. B188106.

July 11, 2006.

**Background:** Consumer brought class action,
under Unfair Competition Law (UCL) and False
Advertising Law (FAL), against manufacturer of
mouthwash, alleging manufacturer marketed
mouthwash in misleading manner by indicating use
of mouthwash could replace use of dental floss in
reducing plaque and gingivitis. The Superior Court,
Los Angeles County, No. BC327114, Carl J. West,
J., certified class of all persons who purchased
mouthwash during specified time period.
Manufacturer petitioned for writ of mandate.

**Holdings:** The Court of Appeal, Klein, P.J., held
that:

10(1) for class action under UCL or FAL, each
class member must meet standing requirement of
suffering loss;

12(2) mere likelihood of harm to members of public
was insufficient for standing under UCL or FAL;

14(3) Proposition 64 added reliance element to
misrepresentation claims brought under UCL or
FAL; and

16(4) certified class was overly broad.

Writ issued.

**[1] Antitrust and Trade Regulation 29T €⇒0**

29T Antitrust and Trade Regulation
The Unfair Competition Law (UCL) was enacted to
protect consumers as well as competitors from
unlawful, unfair, or fraudulent business acts or
practices, by promoting fair competition in
commercial markets for goods and services. West's
Ann.Cal.Bus. & Prof.Code § 17200 et seq.

**[2] Antitrust and Trade Regulation 29T €⇒0**

29T Antitrust and Trade Regulation
The False Advertising Law (FAL) prohibits
consumer deception, and any violation of the FAL
necessarily violates the Unfair Competition Law
(UCL). West's Ann.Cal.Bus. & Prof.Code §§ 17200
et seq., 17500 et seq.

**[3] Statutes 361 €⇒0**

361 Statutes
In interpreting a voter initiative, courts apply the
same principles that govern statutory construction.

**[4] Statutes 361 €⇒0**

361 Statutes
As with ballot pamphlet arguments, a court
reviewing a voter initiative may look to a ballot's
legislative analysis to determine voter intent.

**[5] Statutes 361 €⇒0**

361 Statutes
As a court reviewing a voter initiative is directed to
look at the arguments contained in the official ballot
pamphlet to ascertain voter intent, such an analysis
necessarily includes the arguments advanced by
both the proponents and opponents of the initiative.

**[6] Parties 287 €⇒0**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- Cal.Rptr.3d ----

--- Cal.Rptr.3d ----, 2006 WL 1892581 (Cal.App. 2 Dist.)
(Cite as: --- Cal.Rptr.3d ----)

**287 Parties**
A defendant generally has the right to have class certification issues resolved before the merits of an action are decided.

**[7] Parties 287 ☞0**

287 Parties
Class suits are authorized when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court. West's Ann.Cal.C.C.P. § 382.

**[8] Parties 287 ☞0**

287 Parties
The burden is on the party seeking class certification to establish the existence of both an ascertainable class and a well-defined community of interest among the class members. West's Ann.Cal.C.C.P. § 382.

**[9] Parties 287 ☞0**

287 Parties
The community of interest requirement for class actions embodies three factors: (1) predominant common questions of law or fact, (2) class representatives with claims or defenses typical of the class, and (3) class representatives who can adequately represent the class. West's Ann.Cal.C.C.P. § 382.

**[10] Antitrust and Trade Regulation 29T ☞0**

29T Antitrust and Trade Regulation
For a class action under the Unfair Competition Law (UCL) or False Advertising Law (FAL), each member of the class, rather than only the representative plaintiff, must meet the standing requirement of having suffered injury in fact and lost money or property as a result of the unfair competition or false advertising. West's Ann.Cal.Bus. & Prof.Code §§ 17204, 17535.
*See 13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 124; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2006) ¶ 14:226 et seq. (CACIVP Ch. 14-D*

*); Cal. Jur. 3d, Unfair Competition, § 26; Cal. Civil Practice (Thomson/West 2003) Business Litigation, § 60:12.*

**[11] Parties 287 ☞0**

287 Parties
For a class action, each class member must have standing to bring the suit in his own right, because a class action is merely a procedural device for consolidating matters properly before the court. West's Ann.Cal.C.C.P. § 382.

**[12] Antitrust and Trade Regulation 29T ☞0**

29T Antitrust and Trade Regulation
With the enactment of Proposition 64, which imposes an injury-in-fact standing requirement for private individuals to bring an action under the Unfair Competition Law (UCL) or False Advertising Law (FAL), unless an action under the UCL or the FAL is brought by the Attorney General or local public prosecutors, the mere likelihood of harm to members of the public is no longer sufficient for standing to sue. West's Ann.Cal.Bus. & Prof.Code §§ 17204, 17535.

**[13] Courts 106 ☞0**

106 Courts
Language used in a judicial opinion is to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered.

**[14] Antitrust and Trade Regulation 29T ☞0**

29T Antitrust and Trade Regulation
Proposition 64, which imposed an injury-in-fact standing requirement for private individuals to bring an action under the Unfair Competition Law (UCL) or False Advertising Law (FAL), added a reliance element to misrepresentation claims brought under the UCL or FAL. West's Ann.Cal.Bus. & Prof.Code §§ 17204, 17535.

**[15] Fraud 184 ☞0**

184 Fraud
An element of both actionable fraud and negligent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- Cal.Rptr.3d ----

Page 3

--- Cal.Rptr.3d ----, 2006 WL 1892581 (Cal.App. 2 Dist.)
(Cite as: --- Cal.Rptr.3d ----)

misrepresentation is damage, i.e., pecuniary or property loss, resulting from reliance on the misrepresentation.

**[16] Antitrust and Trade Regulation 29T ☞0**

29T Antitrust and Trade Regulation
Certified class of all persons who purchased certain mouthwash during specified time period was overbroad in consumer's representative action, under Unfair Competition Law (UCL) and False Advertising Law (FAL), against manufacturer of mouthwash, alleging manufacturer marketed mouthwash in misleading manner; each member was required to meet standing requirement of having suffered injury in fact as result of reliance on misrepresentation. West's Ann.Cal.Bus. & Prof.Code §§ 17204, 17535; West's Ann.Cal.C.C.P. § 382.

ORIGINAL PROCEEDINGS in mandate. Carl J. West, Judge. Petition granted.

Kaye Scholer, Thomas A. Smart, Richard A. De Sevo and Jeffrey S. Gordon for Petitioner.
Hugh F. Young, Jr.; Shook, Hardy & Bacon, Paul B. La Scala, Victor E. Schwartz, Cary Silverman, for Product Liability Advisory Council, Inc. as Amicus Curiae on behalf of Petitioner.
Fred J. Hiestand; Morrison & Foerster, William L. Stern, for Civil Justice Association of California, California Chamber of Commerce, California Manufacturers and Technology Association and California Bankers Association, as Amici Curiae on behalf of Petitioner.
National Chamber Litigation Center Inc., Robin S. Conrad; Wiley Rein & Fielding, John E. Barry for the Chamber of Commerce of the United States of America, the Association of National Advertisers, Inc., and the Coalition for Healthcare Communications as Amici Curiae on behalf of Petitioner.
No appearance for Respondent.
Westrup Klick, R. Duane Westrup, Christine C. Choi; Allan A. Sigel for Real Party in Interest.
Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Albert Norman Shelden, Assistant Attorney General, Ronald A. Reiter and

Kathrin Sears, Deputy Attorneys General, as Amicus Curiae.
KLEIN, P.J.
*1 Defendant Pfizer, Inc. (Pfizer), the manufacturer of Listerine mouthwash, seeks a writ of mandate to overturn respondent superior court's November 22, 2005 order certifying a class action filed by plaintiff and real party in interest Steve Galfano (Galfano). The complaint alleges Pfizer marketed Listerine in a misleading manner by indicating the use of Listerine can replace the use of dental floss in reducing plaque and gingivitis.

The trial court certified a class of "all persons who purchased Listerine, in California, from June 2004 through January 7, 2005." In view of the changes in the law brought about by Proposition 64, the class definition is plainly overbroad and must be set aside.

**PRELIMINARY STATEMENT**

[1][2] The Unfair Competition Law (UCL) (Bus. & Prof.Code, § 17200 et seq.) FN1 was enacted to protect consumers as well as competitors from unlawful, unfair or fraudulent business acts or practices, by promoting fair competition in commercial markets for goods and services. (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 949, 119 Cal.Rptr.2d 296, 45 P.3d 243.) The false advertising law (FAL) (§ 17500 et seq., added by Stats.1941, ch. 63, p. 727, § 1) likewise prohibits consumer deception, and any violation of the FAL necessarily violates the UCL. (*Kasky, supra,* at pp. 949-950, 119 Cal.Rptr.2d 296, 45 P.3d 243.)

Over the years, the UCL was an integral part of California law. As the Supreme Court observed in *Stop Youth Addiction, Inc., v. Lucky Stores, Inc., supra,* 17 Cal.4th at page 570, 71 Cal.Rptr.2d 731, 950 P.2d 1086, "whenever the Legislature has acted to amend the UCL, it has done so only to *expand* its scope, never to narrow it."

However, in recent years, the UCL became prone to the sort of abuse "which made the Trevor Law Group a household name in California in 2002 and 2003. The abuse [was] a kind of legal shakedown scheme: Attorneys form[ed] a front 'watchdog' or '

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- Cal.Rptr.3d ----

--- Cal.Rptr.3d ----, 2006 WL 1892581 (Cal.App. 2 Dist.)
(Cite as: --- Cal.Rptr.3d ----)

consumer' organization. They scour[ed] public records on the Internet for what [were] often ridiculously minor violations of some regulation or law by a small business, and sue[d] that business in the name of the front organization." (*People ex rel. Lockyer v. Brar* (2004) 115 Cal.App.4th 1315, 1317, 9 Cal.Rptr.3d 844.)

Proposition 64, an initiative measure approved at the November 2004 general election, was a response to abuse of the UCL and the FAL by certain lawyers, who were bringing "frivolous lawsuits against small businesses even though they had no client or evidence that anyone was damaged or misled." (Ballot Pamp., General Elec. (Nov. 2, 2004) Ballot Argument in Favor of Prop. 64, p. 40.) Proposition 64 imposed new restrictions on private enforcement under the UCL and the FAL.

[3] The instant petition for writ of mandate requires this court to construe some of the key provisions of Proposition 64. In interpreting a voter initiative, " ' we apply the same principles that govern statutory construction. [Citation.] Thus, [1] "we turn first to the language of the statute, giving the words their ordinary meaning." [Citation.] [2] The statutory language must also be construed in the context of the statute as a whole and the overall statutory scheme [in light of the electorate's intent]. [Citation.] [3] When the language is ambiguous, " we refer to other indicia of the voters' intent, particularly the analyses and arguments contained in the official ballot pamphlet." [Citation.] [¶] In other words, our 'task is simply to interpret and apply the initiative's language so as to effectuate the electorate's intent.' [Citation.]" (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 900-901, 135 Cal.Rptr.2d 30, 69 P.3d 951.)

*2 We address, inter alia, whether each member of the putative class asserting a claim under the UCL or the FAL must, in the language of Proposition 64, have suffered injury in fact and lost money or property as a result of such violation, or whether this standing requirement is only applicable to the class representative or named plaintiff.

[4][5] Proposition 64 requires private representative actions to satisfy the procedural requirements

applicable to class action lawsuits. (Ballot Pamp., General Elec. (Nov. 2, 2004) Prop. 64, Official Title & Summary, p 38.) FN2 We conclude that in order to meet the "community of interest" requirement of Code of Civil Procedure section 382 , which requires, inter alia, the class representative to have claims *typical* of the class, it is insufficient if the class representative alone suffered injury in fact and lost money or property as a result of the unfair competition or false advertising. (§§ 17204, 17535.) The class members being represented by the named plaintiff likewise must have suffered injury in fact and lost money or property as a result of such violation. (*Ibid.*)

We further conclude that unless an action under the UCL or the FAL is brought by the Attorney General or local public prosecutors, the mere likelihood of harm to members of the public is no longer sufficient for standing to sue. Persons who have not suffered any injury in fact and who have not lost money or property as a result of an alleged fraudulent business practice cannot state a cause of action merely based on the "likelihood" that members of the public will be deceived. (§§ 17204, 17535.)

Further, inherent in Proposition 64's requirement that a plaintiff suffered "injury in fact ... *as a result of* " the fraudulent business practice or false advertising (§§ 17204, 17535, italics added) is that a plaintiff actually *relied* on the false or misleading misrepresentation or advertisement in entering into the transaction in issue.

We conclude the trial court's ruling, which certified a class consisting of all persons who purchased Listerine in California during a six-month period, is overbroad. We grant the relief requested.

### FACTUAL AND PROCEDURAL BACKGROUND

*1. The proposed class action complaint.*

On January 11, 2005, Galfano filed a consumer action against Pfizer in his individual capacity and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- Cal.Rptr.3d ----

--- Cal.Rptr.3d ----, 2006 WL 1892581 (Cal.App. 2 Dist.)
(Cite as: --- Cal.Rptr.3d ----)

on behalf of all others similarly situated, based upon Pfizer's alleged misrepresentations and failure to disclose material information in the marketing, labeling, advertising and sale of Listerine mouthwash.[FN3] Galfano pled that Pfizer advertised and promoted Listerine in a misleading manner by indicating the use of Listerine can replace the use of dental floss in reducing plaque and gingivitis. The complaint asserted causes of action for breach of express warranty, false advertising under section 17500 and unlawful, unfair and fraudulent business practices under section 17200.

With respect to the class action allegations, Galfano alleged he represented "[a]ll persons who purchased Listerine, in California, from approximately June of 2004 to the date of judgment in this action...."

### 2. *Galfano's motion for class certification.*

*3 On September 9, 2005, Galfano filed a motion for class certification. Galfano sought to certify the following class: "All persons who purchased Listerine with labels that state 'as effective as floss,' in California, from June 28, 2004 through January 7, 2005 ('the Class Period')."

In seeking class certification, Galfano contended the class is ascertainable, the class is so numerous as to render joinder impracticable, an overwhelming community of interests exists among the class, the class representative has claims typical of the class, and the named plaintiff and his counsel adequately represent the class.

### 3. *Pfizer's opposition to class certification.*

Pfizer opposed class certification, arguing the case is replete with factual issues that only can be determined upon individual inquiry of each class member, and which individual inquiries predominate over any common issues. Pfizer enumerated those issues as follows: whether each class member saw or read a label; if so, *which* of the labels was seen or read; whether the consumer was deceived or misled by, or relied on, the label; if so, whether that was part of the bargain and caused the

consumer to buy Listerine; if so, whether the consumer suffered injury in fact and lost money or property as a result of the alleged deception or reliance; and if so, the amount of damages or restitution, given that prices vary and most consumers will not have records of the price(s) they paid.

Pfizer reasoned that a consumer may have purchased Listerine not because of any alleged deception "but because he was brand loyal, he wanted a breath freshener, his dentist recommended it, due to a price promotion, or because the consumer read the label's admonition to 'floss daily' or 'not a replacement for floss' and did not take away any alleged deceptive message, each of which is an individual issue that cannot be resolved on a class-wide basis."

### 4. *Trial court's ruling.*

After hearing the matter, the trial court issued an order on November 22, 2005, certifying a broad class, on an opt-out basis, consisting "of all persons who purchased Listerine, in California, from June 2004 through January 7, 2005."

In its written ruling, the trial court noted "[w]hile Proposition 64 amended [section] 17204's standing requirements to prosecute UCL claims (by mandating that a private party suffer an 'injury in fact' and lose money or property as a result of the practice), *whether the standing requirements for class members also changed under the UCL is an open issue.*" (Italics added.)

The trial court reserved jurisdiction to modify the class definition, decertify the class, or replace Galfano with a new class representative. In certifying the class, the trial court also severed the breach of warranty claim, pending determination of the viability of the UCL claims in subsequent phases of the proceedings.

The trial court also expressed numerous reservations concerning the remedies available to the class. Specifically, "upon proof of false or misleading advertising, or of a fraudulent or unfair

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- Cal.Rptr.3d ----

--- Cal.Rptr.3d ----, 2006 WL 1892581 (Cal.App. 2 Dist.)
(Cite as: --- Cal.Rptr.3d ----)

practice, injunctive relief may be available. However, any restitutionary relief may be problematic. Insofar as the advertising and labeling is no longer in use, injunctive relief may not be appropriate. With respect to restitutionary relief, the requirements of 'injury in fact' or 'lost money or property as a result' of the conduct of Defendant Pfizer, as imposed by Proposition 64, may preclude recovery on a class basis. Similarly, proof of the claim for restitutionary disgorgement appears problematic, to the extent there must be some correlation between the amount of restitutionary relief and conduct justifying recovery. The Court further has reservations with respect to the remedies on Plaintiff's breach of warranty claim, as the measure of damages is defined under Commercial Code § 2714(2)."

*4 Despite its stated reservations, the trial court certified the class in accordance with Galfano's broad definition.

### 5. *Pfizer's writ petition.*

On December 29, 2005, Pfizer filed the instant petition for writ of mandate, seeking vacation of the trial court's order and entry of a new order denying class certification.

[6] This court issued an order to show cause.[FN4]

### CONTENTIONS

Pfizer contends the trial court erred in certifying the class because under Proposition 64, one who maintains an action under the UCL must have suffered injury in fact and have lost money or property as a result of the unfair competition (§ 17204), and this standing requirement applies equally to the named plaintiff and to all class members.[FN5]

### DISCUSSION

#### 1. *Prior law and perceived abuses.*

Section 17200 defines "unfair competition" to include "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of ... the Business and Professions Code."

Prior to the enactment of Proposition 64, the UCL authorized *any person* to sue on behalf of the general public. Former section 17204 provided: " Actions for any relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction by the Attorney General or any district attorney or by any county counsel ... or any city attorney ... *or by any person acting for the interests of itself, its members or the general public.*" (Stats.1993, ch. 926, § 2, italics added.)

Similarly, former section 17535, within the FAL (§ 17500 et seq.) permitted an action to be brought "*by any person* acting for the interests of itself, its members, or the general public." (Stats.1972, ch. 711, p. 1300, § 3, italics added.)

To state a cause of action under the UCL (§ 17200 et seq,) or the FAL (§ 17500 et seq.) for injunctive relief, allegations of actual deception, reasonable reliance and damage were unnecessary (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 211, 197 Cal.Rptr. 783, 673 P.2d 660) and a private plaintiff who had not suffered any injury could sue to obtain relief for others. (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc., supra,* 17 Cal.4th at p. 561, 71 Cal.Rptr.2d 731, 950 P.2d 1086.)

This state of the law led to perceived abuses which Proposition 64 sought to remedy. The ballot argument in favor of Proposition 64 states the initiative was intended to "PROTECT SMALL BUSINESSES FROM FRIVOLOUS LAWSUITS-CLOSE THE SHAKEDOWN LOOPHOLE. [¶] There's a LOOPHOLE IN CALIFORNIA LAW that allows private lawyers to file frivolous lawsuits against small businesses even though they have no client or evidence that anyone was damaged or misled." (Ballot Pamp., General Elec. (Nov. 2, 2004) Ballot Argument in Favor of Prop. 64, p. 40.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- Cal.Rptr.3d ----

--- Cal.Rptr.3d ----, 2006 WL 1892581 (Cal.App. 2 Dist.)
(Cite as: --- Cal.Rptr.3d ----)

*2. Proposition 64 allows private enforcement only if an individual actually was injured and suffered financial or property loss as a result of the unfair competition or false advertising; it also requires private enforcement actions to meet class action requirements.*

*a. Proposition 64 restricts private enforcement to an individual who has suffered injury in fact and lost money or property as a result of unfair competition or false advertising.*

**\*5** Proposition 64 amended section 17204 to provide: "Actions for any relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction by the Attorney General or any district attorney or by any county counsel ... or, with the consent of the district attorney, by a city attorney in any city and county in the name of the people of the State of California upon their own complaint or upon the complaint of any board, officer, person, corporation or association *or by any person who has suffered injury in fact and has lost money or property as a result of such unfair competition.*" (§ 17204, as amended by Prop. 64, § 3, approved Nov. 2, 2004, eff. Nov. 3, 2004; italics added.)

Similarly, Proposition 64 amended section 17535, within the FAL (§ 17500 et seq.) to provide in relevant part: "Actions for injunction under this section may be prosecuted by the Attorney General or any district attorney, county counsel, city attorney, or city prosecutor in this state in the name of the people of the State of California upon their own complaint or upon the complaint of any board, officer, person, corporation or association *or by any person who has suffered injury in fact and has lost money or property as a result of a violation of this chapter.*" (§ 17535, as amended by Prop. 64, § 5, approved Nov. 2, 2004, eff. Nov. 3, 2004; italics added.)

Thus, Proposition 64 now prohibits any person, other than the Attorney General or local public prosecutors from bringing a lawsuit under the UCL or the FAL unless the person has suffered injury and lost money or property as a result of such

violations. (Ballot Pamp ., General Elec. (Nov. 2, 2004) Prop. 64 Analysis by Legislative Analyst, p. 38.)

*b. Proposition 64 also requires private representative actions to meet the requirements of class action lawsuits.*

In addition to restricting who can sue for unfair competition or false advertising, Proposition 64 requires private representative claims to satisfy procedural requirements applicable to class action lawsuits.

Section 17203, as amended by Proposition 64, provides: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition. *Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure,* [ FN6] *but these limitations do not apply to claims brought under this chapter by the Attorney General, or any district attorney, county counsel, city attorney, or city prosecutor in this state.*" (§ 17203, as amended by Prop. 64, § 2, approved Nov. 2, 2004, eff. Nov. 3, 2004; italics added.)

**\*6** Similarly, Proposition 64 amended section 17535 , within the FAL (§ 17500 et seq.) to provide in relevant part: "Actions for injunction under this section may be prosecuted by the Attorney General or any district attorney, county counsel, city attorney, or city prosecutor in this state in the name of the people of the State of California upon their own complaint or upon the complaint of any board, officer, person, corporation or association or by any person who has suffered injury in fact and has lost

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

money·or property as a result of a violation of this chapter. *Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of this section and complies with Section 382 of the Code of Civil Procedure, but these limitations do not apply to claims brought under this chapter by the Attorney General, or any district attorney, county counsel, city attorney, or city prosecutor in this state.*" (§ 17535, as amended by Prop. 64, § 5, approved Nov. 2, 2004, eff. Nov. 3, 2004; italics added.)

With regard to these changes, the legislative analysis in the official ballot pamphlet explained: " Currently, persons initiating unfair competition lawsuits do not have to meet the requirements for class action lawsuits. Requirements for a class action lawsuit include (1) certification by the court of a group of individuals as a class of persons with a common interest, (2) demonstration that there is a benefit to the parties of the lawsuit and the court from having a single case, and (3) notification of all potential members of the class. [¶] ... [¶] proposal [¶] This measure makes the following changes to the current unfair competition law: [¶] .. . [¶] *Requires Lawsuits Brought on Behalf of Others to Be Class Actions.* This measure requires that unfair competition lawsuits initiated by any person, other than the Attorney General and local public prosecutors, on behalf of others, meet the additional requirements of class action lawsuits." (Ballot Pamp., General Elec. (Nov. 2, 2004) Prop. 64 Ballot Analysis by Legislative Analyst, pp. 38-39, original italics.)

*c. Class action requirements; class representative must have claims typical of the class; therefore, all class members, not merely class representative, must have suffered injury in fact and lost money or property due to the unfair competition or false advertising.*

[7][8] Section 382 of the Code of Civil Procedure authorizes class suits in California when " 'the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the

court.' " (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 913, 103 Cal.Rptr.2d 320, 15 P.3d 1071.) The burden is on the party seeking certification to establish the existence of both an ascertainable class and a well-defined community of interest among the class members. ( *Ibid.*)

[9] The community of interest requirement " embodies three factors: (1) predominant common questions of law or fact; (2) *class representatives with claims or defenses typical of the class;* and (3) class representatives who can adequately represent the class." (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470, 174 Cal.Rptr. 515, 629 P.2d 23, italics added; accord *Washington Mutual Bank v. Superior Court, supra,* 24 Cal.4th at p. 913, 103 Cal.Rptr.2d 320, 15 P.3d 1071.)

*7 [10] Galfano and the Attorney General take the position that only the class representative must meet the new standing requirements of Proposition 64, i.e., have suffered injury in fact and lost money or property as a result of the unfair competition or false advertising (§§ 17204, 17535); however, there is no requirement that other class members meet this standing requirement.

[11] The argument is unpersuasive. It is a basic principle that "[e]ach class member must have standing to bring the suit in his own right." (*Collins v. Safeway Stores, Inc.* (1986) 187 Cal.App.3d 62, 73, 231 Cal.Rptr. 638.) This is because a class action is "merely a procedural device for consolidating matters properly before the court." ( *Vernon v. Drexel Burnham Co.* (1975) 52 Cal.App.3d 706, 716, 125 Cal.Rptr. 147.)

If Galfano alone, but not class members, suffered injury in fact and lost money or property as a result of Pfizer's alleged unfair competition or false advertising, then by definition his claim would not be typical of the class. Rather, Galfano's claim would be demonstrably *atypical.*

As explained, Proposition 64 requires private representative actions to satisfy the procedural requirements applicable to class action lawsuits. (Ballot Pamp., General Elec. (Nov. 2, 2004) Prop.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- Cal.Rptr.3d ----

--- Cal.Rptr.3d ----, 2006 WL 1892581 (Cal.App. 2 Dist.)
(Cite as: --- Cal.Rptr.3d ----)

64 Official Title & Summary, p. 38.) In order to meet the "community of interest" requirement of Code of Civil Procedure section 382, which requires, inter alia, the class representative to have claims *typical* of the class, it is insufficient if the class representative alone suffered injury in fact and lost money or property as a result of the violation. (§ § 17204, 17535.) The class members being represented by the named plaintiff likewise must have suffered injury in fact and lost money or property as a result of the unfair competition or false advertising. (*Ibid.*)

> d. *The effect of Proposition 64's requirement of " injury in fact" on the rule that one could state a claim under the UCL or the FAL based on the mere likelihood that members of the public would be deceived; private individuals who have not suffered any injury in fact and who have not lost money or property as a result of an alleged fraudulent business practice or false advertising cannot state a cause of action based merely on the likelihood that members of the public will be deceived.*

[12] Historically, in order to state a cause of action under either the UCL or the FAL, case law only required a showing that " 'members of the public [were] *likely to be deceived.*' [Citations .]" ( *Committee on Children's Television, Inc. v. General Foods Corp., supra,* 35 Cal.3d at p. 211, 197 Cal.Rptr. 783, 673 P.2d 660, italics added.) Allegations of actual deception, reasonable reliance and damage were unnecessary. (*Ibid.*)

The issue is whether the "likely to be deceived" standard can be reconciled with Proposition 64's new standing requirements.

As discussed, Proposition 64 prohibits any person, other than the Attorney General or local public prosecutors, from bringing a lawsuit for unfair competition or false advertising unless the person has suffered "injury in fact" and has lost money or property as a result of such violation. (§§ 17204, 17535, as amended by Prop. 64, §§ 3, 5, approved Nov. 2, 2004, eff. Nov. 3, 2004.) Further, Proposition 64 requires that such actions initiated by any person, other than the Attorney General and

local public prosecutors, on behalf of others, meet the additional requirements of class action lawsuits. (§ 17203, 17535, as amended by Prop. 64, §§ 2, 5, approved Nov. 2, 2004, eff. Nov. 3, 2004.) In order to meet the "community of interest" requirement of Code of Civil Procedure section 382, the class members being represented by the named plaintiff likewise must have suffered injury in fact and lost money or property as a result of the unfair competition or false advertising. (§§ 17204, 17535.)

*8 Therefore, unless an action under the UCL or the FAL is brought by the Attorney General or local public prosecutors, the mere likelihood of harm to members of the public is no longer sufficient for standing to sue. Persons who have not suffered any " injury in fact" and who have not lost money or property as a result of an alleged fraudulent business practice or false advertising (§§ 17204, 17535) cannot state a cause of action based merely on the "likelihood" that members of the public will be deceived.

> e. *Post-Proposition 64 state cases cited by Galfano are unavailing.*

[13] In support of his contention the "likely to be deceived" standard is unchanged, Galfano cites four post-Proposition 64 Court of Appeal decisions: *Progressive West Ins. Co. v. Superior Court* (2005) 135 Cal.App.4th 263, 285, footnote 4, 37 Cal.Rptr.3d 434 (*Progressive* ); *Wayne v. Staples, Inc.* (2006) 135 Cal.App.4th 466, 484, 37 Cal.Rptr.3d 544; *Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 682, 38 Cal.Rptr.3d 36; and *Bell v. Blue Cross of California* (2005) 131 Cal.App.4th 211, 221, 31 Cal.Rptr.3d 688. Galfano's reliance on these decisions is misplaced. It is established that "[l]anguage used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered." (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2, 39 Cal.Rptr. 377, 393 P.2d 689 .)

In *Progressive, supra,* 135 Cal.App.4th at page 271, 37 Cal.Rptr.3d 434, Preciado alleged in his

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- Cal.Rptr.3d ----                                                    Page 10

--- Cal.Rptr.3d ----, 2006 WL 1892581 (Cal.App. 2 Dist.)
(Cite as: --- Cal.Rptr.3d ----)

cross-complaint that Progressive's conduct violated section 17200 as an unlawful, unfair or fraudulent business practice. The cross-complaint alleged: " Progressive has a 'pattern and practice of seeking med-pay reimbursement even though it never engaged in any discussion, analysis or conclusion that the injured party has in fact been made whole' and 'continues to seek[ ] sums it is not entitled to as a matter of law to further its unlawful scheme .' Further, ... Progressive has a 'pattern and practice of ignoring California law by seeking 100% reimbursement for the amounts paid under its med-pay provision. This systematic scheme is contrary to law, and is nothing more than a sharp, illicit business practice.' ... Progressive fails to investigate claims, fails to properly explain policy benefits, misled Preciado and misrepresented material facts pertaining to his claim, imposes unacceptably high reimbursement amounts, and forced Preciado to retain attorneys and incur economic damages to receive proper benefits under the policy." (*Progressive, supra,* at pp. 271-272, 37 Cal.Rptr.3d 434.

*Progressive* held Preciado stated a cause of action under section 17200 for unfair or fraudulent business practices. (*Progressive, supra,* 135 Cal.App.4th at pp. 283-285, 37 Cal.Rptr.3d 434.) In its discussion, *Progressive* relied on the principle that "[a] fraudulent business practice under section 17200 'is not based upon proof of the common law tort of deceit or deception, but is instead premised on whether the public is *likely to be deceived.*' [Citation.] ... A violation can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage. Instead, it is only necessary to show that members of the public are *likely to be deceived.*" [Citations.]' [Citation .]" (*Id.* at p. 284, 37 Cal.Rptr.3d 434, italics added.)

*9 However, *Progressive* does not acknowledge Proposition 64, except for the following statement in a footnote: "We express no opinion as to whether Preciado's attorney fees constitute 'injury in fact' as required under section 17204. Preciado has alleged that the conduct has forced him to incur ' economic damages' in addition to attorney fees." ( *Progressive, supra,* 135 Cal.App.4th at p. 285, fn.

5, 37 Cal.Rptr.3d 434.)

As for *Wayne v. Staples, Inc., supra,* 135 Cal.App.4th at page 484, 37 Cal.Rptr.3d 544, *Colgan v. Leatherman Tool Group, Inc., supra,* 135 Cal.App.4th at page 682, 38 Cal.Rptr.3d 36, and *Bell v. Blue Cross of California, supra,* 131 Cal.App.4th at page 221, 31 Cal.Rptr.3d 688, Galfano acknowledges those cases, although they apply the traditional "likely to be deceived" standard, do not address the effect of Proposition 64.

Therefore, the cited decisions are not authority with respect to the impact of Proposition 64 on the " likely to be deceived" standard.

> *f. The requirement a plaintiff suffered "injury in fact ... as a result of" the fraudulent business practice or false advertising means that a plaintiff must have actually relied on the misrepresentation in entering into the transaction.*

[14] Galfano and Pfizer also differ as to whether Proposition 64 added a reliance element to the UCL and the FAL. Pfizer has the better argument.

[15] Inherent in Proposition 64's requirement that a plaintiff suffered "injury in fact ... *as a result of* " the fraudulent business practice or false advertising ( §§ 17204, 17535, italics added) is that a plaintiff actually *relied* on the misrepresentation and as a result, was injured thereby.[FN7] Here, for example, to have suffered an injury in fact as a result of the alleged misrepresentation, a plaintiff would have had to read Pfizer's label "as effective as floss against plaque and gingivitis" or some similar statement and relied thereon in buying Listerine. A consumer who was unaware of, or who did not rely upon, Pfizer's claims comparing Listerine to floss did not suffer any "injury in fact" as a result of the alleged fraudulent business practice or false advertising.

We note that in *Anunziato v. eMachines, Inc.* (C.D.Cal.2005) 402 F.Supp.2d 1133, a post-Proposition 64 case, the district court reached a contrary conclusion. *Anunziato* held "reading reliance into the UCL and the FAL would subvert

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- Cal.Rptr.3d ----

--- Cal.Rptr.3d ----, 2006 WL 1892581 (Cal.App. 2 Dist.)
(Cite as: --- Cal.Rptr.3d ----)

Page 11

the public protection aspect of those statutes." (*Id.* at p. 1137.)

*Anunziato* reasoned: "[T]he Court can envision numerous situations in which the addition of a reliance requirement would foreclose the opportunity of many consumers to sue under the UCL and the FAL. One common form of UCL or FAL claim is a 'short weight' or 'short count' claim. For example, a box of cookies may indicate that it weighs sixteen ounces and contains twenty-four cookies, but actually be short. Even in this day of increased consumer awareness, not every consumer reads every label. If actual reliance were required, a consumer who did not read the label and rely on the count and weight representations would be barred from proceeding under the UCL or the FAL because he or she could not claim reliance on the representation in making his or her purchase. Yet the consumer would be harmed as a result of the falsity of the representation." (*Anunziato v. eMachines, Inc., supra,* 402 F.Supp.2d at p. 1137.)

*10 While *Anunziato* expressed an understandable concern, it would appear the court substituted its judgment for that of the voters and based its decision on the perceived ill effects a "reliance" requirement would have in hypothetical fact situations.

In view of Proposition 64's express requirement that a plaintiff suffered "injury in fact ... *as a result of* " the fraudulent business practice or false advertising ( §§ 17204, 17535, italics added), we believe the district court's decision in *Laster v. T-Mobile USA Inc.* (S.D.Cal.2005) 407 F.Supp.2d 1181, sets forth the correct interpretation.

*Laster* held "[b]ecause Plaintiffs fail to allege they actually relied on false or misleading advertisements, they fail to adequately allege causation as required by Proposition 64." (*Laster v. T-Mobile USA Inc., supra,* 407 F.Supp.2d at p. 1194 .) *Laster* noted the plaintiffs failed to allege they " relied on Defendants' advertisements in entering into the transactions. While Plaintiffs meticulously describe the allegedly misleading advertisements (as later described in Plaintiffs' pleadings, a ' bait-and-switch' leading to a 'fleece'), none of the

named Plaintiffs allege that they saw, read, or in any way relied on the advertisements; nor do they allege that they entered into the transaction *as a result* of those advertisements." (*Ibid.*)

Accordingly, the requirement a plaintiff suffered " injury in fact ... *as a result of* " the fraudulent business practice or false advertising (§§ 17204, 17535, italics added) means that Galfano or others must have purchased the Listerine in reliance on the allegedly false or misleading representations or advertisements and as a result suffered injury.

## CONCLUSION

[16] For the reasons stated above, we conclude the trial court erred as a matter of law in certifying a class of "all persons who purchased Listerine, in California, from June 2004 through January 7, 2005. " In view of the changes in the law brought about by Proposition 64, the class definition is plainly overbroad and must be set aside.[FN8][FN9]

We recognize this initiative measure, which was promoted as adding a standing requirement to the UCL and FAL, has had the effect of dramatically restricting these consumer protection measures. For example, as the district court recognized in *Anunziato,* the addition of a reliance requirement may preclude a consumer who did not read and rely on a label from stating a UCL or FAL claim in a " ' short weight' " or " 'short count' " case. ( *Anunziato v. eMachines, Inc., supra,* 402 F.Supp.2d at p. 1137.) However, this court must take the statutory language as it finds it. Given the new restrictions on private enforcement under the UCL and the FAL, enforcement of these statutes in legitimate cases is increasingly the responsibility of a vigilant state Attorney General and/or local public prosecutors.[FN10]

## DISPOSITION

The order to show cause is discharged. The petition for writ of mandate is granted. Let a peremptory writ of mandate issue, directing respondent superior court to vacate its November 22, 2005 order

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- Cal.Rptr.3d ----

--- Cal.Rptr.3d ----, 2006 WL 1892581 (Cal.App. 2 Dist.)
(Cite as: --- Cal.Rptr.3d ----)

granting Galfano's motion for class certification and to enter a new and different order denying the motion. Pfizer shall recover its costs in this proceeding. (Cal. Rules of Court, rule 56(*l* ).)

We concur: CROSKEY and KITCHING, JJ.

> FN1. The modern UCL first appeared in 1933, as an amendment to Civil Code former section 3369. (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 568-569, fn. 8, 71 Cal.Rptr.2d 731, 950 P.2d 1086.) In 1977, the Legislature moved the UCL to section 17200 et seq. of the Business and Professions Code. (*Stop Youth Addiction, Inc.* at p. 570, 71 Cal.Rptr.2d 731, 950 P.2d 1086; Stats.1977, ch. 299, p. 1202, § 1.)
> All further statutory references are to the Business and Professions Code, unless otherwise indicated.

> FN2. "As with ballot pamphlet arguments, a reviewing court may look to a ballot's legislative analysis to determine voter intent. [Citation.] [¶] Finally, as a reviewing court is directed to look at the arguments contained in the official ballot pamphlet to ascertain voter intent, it is well settled that such an analysis necessarily includes the arguments advanced by both the proponents and opponents of the initiative. [Citation.]" (*Robert L. v. Superior Court, supra,* 30 Cal.4th at p. 906, 135 Cal.Rptr.2d 30, 69 P.3d 951.)

> FN3. On November 2, 2004, the electorate approved Proposition 64, which amended the standing requirements of the UCL and the FAL. (§§ 17200 et seq., 17203, 17204, 17500 et seq., 17535.) Galfano commenced this action *after* the effective date of Proposition 64. There is no contention that Proposition 64 is not fully applicable to this case.

> FN4. A defendant generally has the right to have class certification issues resolved

before the merits of an action are decided. (*Employment Development Dept. v. Superior Court* (1981) 30 Cal.3d 256, 262, 178 Cal.Rptr. 612, 636 P.2d 575.)

> FN5. By way of additional arguments, Pfizer contends the trial court abused its discretion in finding that common issues predominate over individual ones, that Galfano's claims are typical, that Galfano is an adequate class representative, that class treatment will provide substantial benefits, and in finding an ascertainable class.

> FN6. Code of Civil Procedure section 382, pertaining to class actions, provides: "If the consent of any one who should have been joined as plaintiff cannot be obtained, he may be made a defendant, the reason thereof being stated in the complaint; and when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

> FN7. Similarly, an element of both actionable fraud and negligent misrepresentation is damage, i.e., pecuniary or property loss, resulting from *reliance* on the misrepresentation. (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, §§ 816, 818.)

> FN8. We note the class definition, extending to anyone who purchased Listerine in California within a six-month period, is overbroad for other reasons as well. For example, Pfizer's opposition papers showed that of 34 different Listerine mouthwash bottles, 19 never included any label that made any statement comparing Listerine mouthwash to floss. Further, even as to those flavors and sizes of Listerine mouthwash bottles on which Pfizer did place the labels which are at issue herein, not every bottle shipped

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- Cal.Rptr.3d ----

--- Cal.Rptr.3d ----, 2006 WL 1892581 (Cal.App. 2 Dist.)
**(Cite as: --- Cal.Rptr.3d ----)**

between June 2004 and January 2005 bore such a label.

FN9. Our ruling herein is without prejudice to Galfano's bringing a new motion for class certification, consistent with the principles set forth in this opinion.

FN10. This case illustrates some of the shortcomings of the initiative process. " When a statute enacted by the initiative process is involved, the Legislature may amend it only if the voters specifically gave the Legislature that power, and then only upon whatever conditions the voters attached to the Legislature's amendatory powers. (Cal. Const., art. II, § 10, subd. (c); *Amwest [Surety Ins. Co. v. Wilson* (1995) ] 11 Cal.4th 1243, 1251, 48 Cal.Rptr.2d 12, 906 P.2d 1112.)" ( *Proposition 103 Enforcement Project v. Quackenbush* (1998) 64 Cal.App.4th 1473, 1483-1484, 76 Cal.Rptr.2d 342.) Proposition 64 does not include a provision empowering the Legislature to amend it.

Cal.App. 2 Dist.,2006.
Pfizer Inc. v. Superior Court
--- Cal.Rptr.3d ----, 2006 WL 1892581 (Cal.App. 2 Dist.)

Briefs and Other Related Documents (Back to top)

• B188106 (Docket) (Dec. 29, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.